IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

JOANNA POLANCO, <u>et al.</u>,

    Plaintiffs,

    v.

UPS FREIGHT SERVICES, INC., <u>et al.</u>,

    Defendants.

CIVIL NO. 13-1921 (PAD)

## OPINION AND ORDER

Delgado-Hernández, District Judge.

    Joanna Polanco and Yolanda Escudero initiated this employment discrimination, hostile work environment, and retaliation against UPS Freight Services, Inc. under various Federal and Puerto Rico statutes (Docket No. 31).[1]  Polanco's husband, José L. Nevárez, joined in the action, claiming to have suffered damages resulting from his spouse's suffering.  <u>Id.</u> at ¶¶ 7, 94 and 95. Before the court are UPS's "Motion(s) for Summary Judgment" (Docket Nos. 106 and 107), which plaintiffs opposed (Docket Nos. 108 and 113).  UPS replied (Docket Nos. 118 and 120).  Plaintiffs surreplied (Docket No. 124).

    For the reasons explained below, UPS's motion on Polanco and Nevárez (Docket No. 106) is DENIED except for (1) the national-origin discrimination claims; and (2) the Law No. 115 retaliation claim.  However, the motion regarding Escudero (Docket No. 107) is GRANTED IN

---

[1] More specifically, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e <u>et seq.</u> ("Title VII") and 42 U.S.C. § 1981(a); Puerto Rico's general anti-discrimination statute, Law No. 100 of June 30, 1959, P.R. Laws Ann. tit. 29 §§ 146, <u>et seq.</u> ("Law 100"); Puerto Rico Law No. 17 of April 22, 1988, P.R. Laws Ann. tit. 29 §155 <u>et seq.</u> ("Law 17"); Puerto Rico Law No. 69 of July 6, 1985, P.R. Laws Ann. tit. 29 § 1321 <u>et seq.</u> ("Law 69"); Puerto Rico Law No. 115 of December 20, 1991, 29 P.R. Ann. Stat. 194 <u>et. seq.</u> ("Law 115"); and Articles 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 §§ 5141 and 5142 (Docket No. (Docket No. 31 at ¶¶ 10, 11).  Polanco additionally included an unjust discharge claim under Puerto Rico's Unjust Discharge Act, Law No. 80 of May 30, 1976, P.R. Laws Ann. tit. 29 §§ 185a, <u>et seq.</u> ("Law 80").

Joanna Polanco, et al. v. UPS Freight Services, Inc., et al.
Civil No. 13-1921 (PAD)
Opinion and Order
Page 2

PART, to dismiss the federal claims with prejudice and the state claims without prejudice.   To

facilitate review, the materials have been organized under the following topics:

I.      BACKGROUND……………………………………………   3

II.     STANDARD OF REVIEW ………………………………   3

III.    FINDING OF FACTS………………………….…..……...   4

        a.  UPS's Business Relationship with UW………..……...   4

        b.  The Puerto Rico Terminal……………………………...   7

        c.  Escudero's Employment with UW……..……………   8

        d.  Incidents between Rosario and Escudero Prior to August
            27, 2012……..……………………………………...   9

        e.  Escudero's Complaint against Rosario and the Ensuing
            Investigations…………………………………………   10

        f.  Escudero's EEOC Charge and Rosario's Subsequent
            Behavior…………………………………………....   13

        g.  Polanco's Employment with UPS………….…….…...   14

        h.  Preparation of Shipping Documents……………..……   15

        i.  Calculation of Volume and Cube Utilization…….…….   16

        j.  Investigation as to Cube Utilization………….…..……   18

        k.  Polanco's Termination……………………………..….   21

IV.     DISCUSSION…………………………………….…..…   22

        A.  Polanco…………………………………………………   22

            1.  Title VII ……………………………...…………   22

                i.    Discrimination...…..……………………….…...   22

                ii.   Hostile Work Environment………………………   30

                iii.  Retaliation……………………………………   36

            2.  Puerto Rico Law…..…………………..……………   39

                i.    Discrimination...……..…………………………   39

                ii.   Hostile Work Environment………………………   42

                iii.  Retaliation…………………………………………   43

                iv.   Unjust Discharge………………………………   44

Joanna Polanco, et al. v. UPS Freight Services, Inc., et al.
Civil No. 13-1921 (PAD)
Opinion and Order
Page 3

      B.  Nevárez………………………………………….……..    45

      C.  Escudero………………………………………………    45

   V.     CONCLUSION………………………………………    51

# I.  BACKGROUND

During the relevant period, Polanco and Escudero worked at UPS's distribution center in Guaynabo, Puerto Rico.  Polanco was an employee of UPS, whereas Escudero was an employee of Universal Warehouse ("UW"), a UPS contractor.  Both claim to have been discriminated against because of their sex and national origin and subjected to a hostile work environment on account of their sex.  In addition, they say UPS retaliated against them for having complained of discrimination.  Nevárez requests compensation for damages linked to Polanco's claims (Docket No. 31).  UPS contends it was never Escudero's employer, and challenges the sufficiency of evidence to sustain the asserted claims (Docket No. 106).  In consequence, it seeks entry of summary judgment dismissing all claims with prejudice under Rule 56 of the Federal Rules of Civil Procedure.[2]

# II.  STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The purpose of summary judgment is to pierce the pleadings and assess the proof in order to see whether there is need for trial.  Mesnick v. General Electric Co., 950 F.2d 816, 822 (1st Cir. 1991).

The party moving for summary judgment bears the initial responsibility of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

---

[2] UPS's motion did not specifically request the dismissal of Nevárez' claim under Articles 1802 and 1803 of the Puerto Rico Civil (Docket No. 106).  Inasmuch as such claim is contingent upon Polanco's discrimination action, the court construes UPS's Rule 56 motion as encompassing Polanco's husband's claim.  See, Marcano-Rivera v. Pueblo, 232 F.3d 245, 258 n.7 (1st Cir. 2000).

A factual dispute is "genuine" if it could be resolved in favor of either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). It is "material" if it potentially affects the outcome of the case in light of applicable law. Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004).

As to issues on which the nonmovant has the burden of proof, the movant need to no more than aver absence of evidence to support the nonmoving party's case. Celotex Corp., 477 U.S. at 325; Mottolo v. Fireman's Fund Ins. Co., 43 F.3d 723, 725 (1st Cir. 1995). All reasonable factual inferences must be drawn in favor of the party against whom summary judgment is sought. Shafmaster v. U.S., 707 F.3d. 130, 135 (1st Cir. 2013). Record review shows absence of genuine factual dispute as to the facts identified in the section that follows.

### III. FINDINGS OF FACTS[3]

#### a. UPS's Business and Relationship with Universal Warehouse

UPS is a logistics company. It moves cargo for customers using a method called intermodal shipping, combining ocean and truck shipping (Docket No. 106-2, "Defendant's Statement of Uncontested Material Facts in Support of the Motion for Summary Judgment as to Claims Made

---

[3] As part of their opposition, plaintiffs submitted 113 additional statements of uncontested facts (Docket Nos. 108-1 and 113-1) and 554 pages of supporting documents. Most of these statements were referenced in their responses to defendant's statements of uncontested facts (Docket Nos. 108-2 and 113-2) and, thus, were considered by the court when determining whether defendant's statements of uncontested facts were really uncontroverted. The court notes, however, a significant problem with plaintiffs' submission of their additional uncontested facts insofar as most of these additional statements consist of paragraphs that contain multiple sentences and a string of deposition pages and exhibits at the end of the paragraphs, without identifying the reference to the record supporting each assertion within the paragraph. In fact, plaintiffs do not even identify the specific record material supporting the entire paragraph. Plaintiffs' failure to comply with Local Rule Civ. P. 56(e), which requires "a citation to the specific page or paragraph of identified record material supporting the assertion," violates the court's anti-ferret rule. See, Carreras v. Sajo, García & Partners, 596 F.3d 25, 31 (1st Cir. 2010)("Failure to comply with the anti-ferret rule permits the court to 'disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment'"). Due to the lack of specific references to the record, the court had a hard time combing through the pile of documents submitted by plaintiffs to try to decipher which statements have some support on the record. The additional statements that were supported by the record, which were also referenced in plaintiffs' response to defendant's SUMF-1 and 2, have been incorporated to this section. In addition, some of plaintiffs' additional statements, even if supported, are irrelevant for purposes of summary judgment. Although the court reviewed them as well as their supporting materials, it will only consider and include in this Opinion and Order those facts that are material for purposes of summary judgment as mandated by Fed.R.Civ.P. 56. Finally, some of the additional "statements" plaintiffs submitted are really arguments of counsel and allegations contained in the complaint which, pursuant to Fed.R.Civ.P. 56 must be disregarded. See, Serra v. Quantum Servicing Corp., 747 F.3d 37, 43 (1st Cir. 2014)(holding that standing alone, allegations made in a plaintiff's complaint are not enough to oppose a properly supported motion for summary judgment).

by Plaintiffs Joanna Polanco and José L. Nevárez" ("SUMF-1") at ¶ 1).  UW provides warehousing

and office services and space for UPS in Puerto Rico.  SUMF-1 at ¶ 5.  It has provided those

services to UPS since at least 2004 or 2005.  SUMF-1 at ¶ 5.  In addition, it is responsible for

coordinating the delivery of packages belonging to UPS customers through independent truck

drivers, and of loading packages belonging to UPS customers into containers destined to the

mainland U.S.  SUMF-1 at ¶ 6.

When delivering shipments to UPS's customers, UW mixes shipments with those of other

UW customers in a way that it is most efficient for UW (Docket No. 107-2, "Defendant's Statement

of Uncontested Material Facts in Support of the Motion for Summary Judgment as to Claims Made

by Plaintiff Yolanda Escudero" ("SUMF-2") at ¶ 3).  It has similar relationships with other

companies, such as Saia Motor Freight, A Duie Pyle, and Selective Transportation.  SUMF-1 at ¶

7.

The agreement between UW and UPS stipulates that certain functions of UPS's operation

will be executed by employees of UW.  SUMF-2 at ¶ 5.  However, UW has its own work force,

and may choose to staff the operation any way it finds appropriate.  SUMF-2 at ¶ 5.  UW employees

do not report directly to UPS.  SUMF-2 at ¶ 7.[4]  They report to UW, specifically to Josué Bernardi,

General Manager of UW, and to Carmen Carmona, Supervisor of UW.  SUMF-2 at ¶ 7.  Bernardi's

boss is Marcos Rodríguez, President of UW.  SUMF-2 at ¶ 7.

Rodríguez is not an employee of UPS, and does not have any relationship with UPS other

than the one established in the agreement between UPS and UW.  SUMF-2 at ¶ 8.  He is not a

---

[4] Plaintiffs' response to this statement consists of a paragraph that cites to six different Opposing Statements of Uncontested Material Facts ("OSUMF"), each of which contains multiple sentences, and which make reference to sixty-tree pages of deposition transcript, plus the entire agreement between UPS and UW (Docket No. 113-2 at ¶ 7).  Plaintiffs' failure to comply with Local Rule Civ. P. 56(e), which requires "a citation to the specific page or paragraph of identified record material supporting the assertion," violates the court's anti-ferret rule.  As such, the statement is admitted.  See, Carreras, 596 F.3d at 31 ("Failure to comply with the anti-ferret rule permits the court to 'disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment'").

member of the Board of Directors of UPS or any of its related entities, and does not have any decisional power within UPS.  SUMF-2 at ¶ 8.  Likewise, UPS and its affiliated companies do not have any proprietary interest in UW.  SUMF-2 at ¶ 9.  UPS and UW have distinct and separate boards of directors, shareholders and proprietors.  SUMF-2 at ¶ 7.  Rodríguez is the sole proprietor of UW.  SUMF-2 at ¶ 9.  UW could refuse to offer services for UPS by terminating the UPS contract, which it can unilaterally do with a sixty-day notice.  SUMF-2 at ¶ 10.

UPS has its own Human Resources Department ("HR") to handle UPS personnel.  It is not involved in personnel management for UW.  SUMF-2 at ¶ 17.  Nor does it have the authority to discipline or terminate UW employees.  SUMF-2 at ¶ 12.  Bernardi is the only person authorized to make decisions affecting UW employees assigned to the UPS account.  SUMF-2 at ¶ 11.[5]  When a UW employee does something wrong, UPS employees can speak directly to the UW employee only if it involves a small problem such as an incorrect address in a customer bill.  If the matter encompasses a larger problem, UPS will communicate with UW, and UW management will speak directly to its employee.  SUMF-2 at ¶¶ 13-14.[6]

UPS has minimal control over the strategies and methods used by UW to comply with its responsibilities under the UPS agreement.  SUMF-2 at ¶ 15.[7]  Nevertheless, UW employees are trained by UPS and guided by UPS operational methods in using UPS systems, for UW is expected

---

[5] Plaintiffs' clarification that UPS's Operations Supervisor "has the liberty to address . . . or go directly to UW" regarding employees issues (Docket No. 113-2 at ¶ 11) does not controvert the fact that only Bernardi can authorize changes to UW's employees work schedules and that he is the only one who can make personnel management decisions regarding those employees.

[6] Plaintiffs refer to OSUMF-2 ¶ 6, which nowhere states that UPS employees can deal directly with UW employees regarding larger problems (Docket No. 113-2 at ¶ 11).  Thus, the statement is deemed admitted.

[7] In an attempt to controvert this statement, plaintiffs cite three different OSUMF, which make reference to twenty-seven pages of deposition transcript (Docket No. 113-2 at ¶ 15), without complying with Local Rule Civ. P. 56(e) and including "a citation to the specific page or paragraph of identified record material supporting the assertion."  Given plaintiffs' violation of the court's anti-ferret rule, the statement is deemed admitted.

to comply with UPS's operating policies and procedures.  SUMF-2 at ¶ 15.[8]  As to UW employees,

UPS's focus is on having the customer's cargo delivered in a timely manner.  SUMF-2 at ¶ 16.[9]

**b.  <u>The Puerto Rico Terminal</u>**

UPS's Puerto Rico terminal operates with two primary groups: the operations group and

the sales group.  SUMF-1 at ¶ 8.  Sales and operations people in Puerto Rico are at the same

hierarchical level.  SUMF-1 at ¶ 8.  The terminal manages concurrently two types of shipments:

shipments of packages which come from the mainland U.S. to Puerto Rico, which are known in

the company as "southbound shipments;" and shipments exiting Puerto Rico to the mainland U.S.,

known as "northbound shipments."  SUMF-1 at ¶ 9.

Richard Shearer, Manager of Puerto Rico Operations, and Michael Mackey, Director of

Business Development for Canada, Mexico and Puerto Rico, manage UPS's Puerto Rico terminal.

SUMF-1 at ¶ 10.  They are both stationed outside of Puerto Rico (Docket No. 108-1, "Plaintiffs'

Opposing Statement of Uncontested Material Facts" ("OSUMF-1") at ¶ 16 and 17; Docket No.

118-2 at ¶¶ 16 and 17).  Shearer reports directly to Mackey.  SUMF-1 at ¶ 14.  In 2012, the sales

group consisted of John Rosario, Anabel Marxuach, and Orlando Santos.  SUMF-1 at ¶ 11.  Rosario

was a lead sales person, but all sales employees reported to Mackey.  SUMF-1 at ¶¶ 11 and 20.

Mackey, in turn, reported to Paul Fleming.  SUMF-1 at ¶ 11.[10]

---

[8] In an attempt to controvert this statement, plaintiffs cite three different OSUMF, which make reference to twenty-seven pages of deposition transcript, without complying with Local Rule. Civ. P. 56(e) and including "a citation to the specific page or paragraph of identified record material supporting the assertion" (Docket No. 113-2 at ¶ 15).  In light of plaintiffs' violation of the court's anti-ferret rule, the statement is deemed admitted.

[9] Plaintiffs denied this statement as drafted, claiming that UPS also had financial goals, as evidenced by the fact that Polanco and Rosario had to meet profitability criteria and received incentive payments based on their achieving of these goals (Docket No. 113-2 at ¶ 16).  However, this falls short of controverting the statement, since Polanco and Rosario were both UPS employees, not UW's employees.  That UPS had profitability goals it applied to its own employees does not controvert that, with regards to UW, UPS focused on whether the cargo was delivered in a timely manner.  Thus, the statement is admitted.

[10] Plaintiffs' qualifications do not contest this fact.  Their qualifications are devoted to including additional facts that are not inconsistent and in no way controvert statement no. 11.

### c.  Escudero's Employment with UW

Escudero is a UW employee assigned to work on the UPS account in UPS's distribution center.  SUMF-2 at ¶ 18;[11] Docket No. 113-1, "Plaintiffs' Opposing Statement of Uncontested Material Facts" ("OSUMF-2") at ¶¶ 1 and 21.  She deals with notification of UPS's customers for tax occurrences, and notifies them as to the status of their shipments.  SUMF-2 at ¶ 18;[12] OSUMF-2 at ¶ 1.  Ángel Morales supervises her.  SUMF-2 ¶ 18.[13]  As a UW employee, she is required to follow Bernardi's instructions. SUMF-2 at ¶ 19.  Bernardi was the person who interviewed, hired and talked to her about company policies.   SUMF-2 at ¶ 19.[14]  In addition, UW determines her salary and reviews her performance.  SUMF-2 at ¶ 19.[15]

Escudero has never been an employee of UPS.  SUMF-2 at ¶ 22.  UPS does not know what Escudero's compensation is; does not compensate her in any way; and does not provide her with benefits such as paid leave.  SUMF-2 at ¶¶ 22-23.  Nor does it maintain employment records of Escudero or have insurance policies covering her or any other UW employee.  SUMF-2 at ¶ 24.

---

[11] Plaintiffs "denied as drafted" this statement.  However, their response and record citation have nothing to do with this statement but with Escudero's supervisors and the work environment (Docket No. 113-2 at ¶ 18; OSUMF-2 at ¶ 15).  Thus, the statement is deemed admitted.

[12] Although plaintiffs "denied as drafted" this statement, their response and record citation have nothing to do with this statement but with Escudero's supervisors and the work environment (Docket No. 113-2 at ¶ 18; OSUMF-2 at ¶ 15).  As a result, the statement is deemed admitted.

[13] Plaintiff does not dispute that Ángel Morales supervises her, but adds that Orlando Santos also supervises her for UPS (Docket No. 113-2 at ¶ 18; OSUMF-2 at ¶ 15).  Defendants deny that Orlando Santos supervises her and claim that Escudero's assertion to the contrary is a self-serving conclusory allegation that should be disregarded (Docket No. 120-1 at ¶ 18).  In the main, the core statement is undisputed.

[14] Although plaintiffs "denied in part" this statement, their response and record citation have nothing to do with this statement but with the work environment and with someone wanting Escudero fired (Docket No. 113-2 at ¶ 19).  Accordingly, the statement is deemed admitted.  Furthermore, plaintiffs' response contravene the anti-ferret rule, since they fail to cite to the specific part of the record that purportedly supports their contention.

[15] Plaintiffs "denied in part" this statement.  Yet, their response and record citation have nothing to do with the statement but with the work environment and that someone wanted Escudero fired (Docket No. 113-2 at ¶ 19).  So, the statement is deemed admitted.  In addition, plaintiffs' response contravenes the anti-ferret rule because they fail to cite to the specific part of the record that allegedly supports their contention.

UPS does not pay UW the salary of UW employees assigned to work on the UPS account. SUMF-2 at ¶ 22.

UPS cannot discipline Escudero. SUMF-2 at ¶ 64. It does not have the legal authority to alter the terms and conditions of her employment. SUMF-2 at ¶ 65.[16] Similarly, Rosario could not personally remove UW employees from the UPS account, and lacked the power or authority to undertake tangible employment actions over Escudero. SUMF-2 at ¶ 20. He would have to go through UW management to do so. SUMF-2 at ¶¶ 20 and 21.

### d. Incidents between Rosario and Escudero Prior to August 27, 2012

At some point between September and October 2011, Rosario arrived one day at the office, approached Escudero's cubicle, and remarked that her lipstick was worthy of a "black 8." SUMF-2 at ¶ 26.[17] Escudero was perplexed by the remark, but Rafymar Curvello, a UW employee, informed her it was a type of anal sexual relation. SUMF-2 at ¶ 26. Some weeks or months after this incident, Rosario told Escudero, "Yolanda, come with me to the warehouse . . . to teach you how to say mom and pop backwards." SUMF-2 at ¶ 27. Escudero turned around to her desk and continued working. SUMF-2 at ¶ 27. Rosario then called Escudero a coward. SUMF-2 at ¶ 27. A week or two after that incident, Rosario remarked in the office, "Yolanda, come back with me to the warehouse," adding "so that I can show you where the Christmas tree has its balls." SUMF-2 at ¶ 28.

---

[16] Plaintiffs admitted this much. They, however, claim that, regardless of the lack of authority to alter the terms and conditions of Escudero's employment contract, the sexual harassment she was allegedly subject to did in fact alter her terms and conditions of employment. In support, they make reference to nine paragraphs of their OSUMF-2, which in turn cite to sixty-three pages of deposition transcripts, plus two declarations under penalty of perjury (Docket No. 113-2 at ¶ 65), without citing to the specific part of the record that supports their contention, in clear contravention of the anti-ferret rule. Given the ultimate disposition of Escudero's claims, it is not necessary to examine the issue in more detail.

[17] The exact meaning of this term is unknown to the court.

Joanna Polanco, et al. v. UPS Freight Services, Inc., et al.
Civil No. 13-1921 (PAD)
Opinion and Order
Page 10

Escudero claims she verbally reported these last two incidents to Polanco, UPS's Operations Supervisor, the same day they took place.  SUMF-2 at ¶ 29.  Around a month later, when Escudero was using the photocopier, Rosario approached her, stating, "[t]hose pants would suit you better if you lose some weight.  You don't look bad, but they would suit you better if you lose some weight."  SUMF-2 at ¶ 30.  On another occasion, Rosario came to the office and said, "[t]he day is rainy, very rainy.  It is good for having sex.  And with me, there is no problem because I go down under."  SUMF-2 at ¶ 31.  Rosario did not make this comment to Escudero directly, but rather made it out load while standing in the hallway.  SUMF-2 at ¶ 31.

   **e.   Escudero's Complaint against Rosario and the Ensuing Investigations**

On August 24, 2012, Rosario told Polanco he had observed Escudero being "dry humped" in the office area by a driver named Juan Rodríguez.  SUMF-2 at ¶ 32.[18]  He commented that such conduct was unacceptable, and action had to be taken.  SUMF-2 at ¶ 32.[19]  Further, he informed Carmona what had allegedly happened, asking her if she knew about the incident.  SUMF-2 at ¶ 33.  Carmona responded she was not aware of any such incident, but would notify Bernardi and investigate it. SUMF-2 at ¶ 33.

That same day Carmona approached the driver, who denied ever having rubbed himself against Escudero.  SUMF-2 at ¶ 34.  After speaking to the driver, Carmona went to Joseline Martínez– a UW employee – and asked her if she saw anything happen.  SUMF-2 at ¶ 35.  Joseline informed her she had not seen anything.  SUMF-2 at ¶ 35.  Carmona asked Polanco, who denied having seen anything irregular.  SUMF-2 at ¶ 35.

---

[18] The driver was not an UPS employee (Docket No. 120-2 at ¶ 17).

[19] At some point between August and October 2011, Rosario had allegedly once asked to have Escudero terminated, but the record does not specify why Rosario did so (Docket No. 120-2 at ¶ 113).

On August 27, 2012, Escudero arrived for work and was approached by Polanco. SUMF-2 at ¶ 36. Polanco told her that on the previous Friday, Rosario had made accusations against her, stating that he had seen Escudero in a "sexual situation" with one of the drivers. SUMF-2 at ¶ 36. Escudero stated the incident never occurred. SUMF-2 at ¶ 36.[20] After being informed of Rosario's allegations, Escudero went to Bernardi's office, for he was the top managerial figure in UW and she thought he could protect her. SUMF-2 at ¶ 37.[21] Similarly, she spoke to Rodríguez, because she was aware that Rodríguez, as owner of UW, had direct contact with Rosario's supervisor, and she wanted him to talk to UPS. SUMF-2 at ¶ 38. In addition, she talked to Luis Olivero, Human Resources Supervisor for United Parcel Service.[22] SUMF-2 at ¶ 39.[23] Bernardi ordered Carmona to investigate, conduct interviews, and prepare a written report. SUMF-2 at ¶ 41. In turn, Rodríguez contacted Mackey, informed him of the situation, and asked him to "do whatever he had to do." SUMF-2 at ¶ 42.

UPS designated Olivero and Ilka Ramón, Human Resources Manager for United Parcel Service to investigate Escudero's concern.[24] SUMF-2 at ¶ 43.[25] Between September 19 and

---

[20] According to Escudero's deposition testimony, Polanco "tried to console her" by telling her that Rosario was always saying things about everyone else; the people at the office knew her and also knew Rosario; and she should not pay attention to the matter. OSUMF-2 at ¶ 11.

[21] Plaintiffs' response that Escudero went to other persons beside Bernardi to see if they could intervene with UPS on her behalf (Docket No. 113-2 at ¶ 37) does not controvert the statement. As such, the same is admitted.

[22] UPS and United Parcel Service are two distinct, although related, companies. They manage human resources separately. SUMF-2 at ¶ 43 n.2; OSUMF-1 at ¶ 24. Olivero does not have any responsibilities or relationship with the Human Resources Department for UPS. However, his intervention was requested because he is located in Puerto Rico. SUMF-2 at ¶ 43 n.2.

[23] In an attempt to controvert this statement, plaintiffs cite two different OSUMFs, which make reference to twenty-seven pages of deposition transcript plus a report (Docket No. 113-2 at ¶ 39), without complying with Local Rule Civ. P. 56(e) and including "a citation to the specific page or paragraph of identified record material supporting the assertion." In light of plaintiffs' violation of the court's anti-ferret rule, the statement is deemed admitted.

[24] See, footnote no. 22.

[25] Plaintiffs denied this statement, referencing to OSUMF-1 at ¶¶ 59 and 60. However, neither paragraph is appropriately supported by a reference to the record. Plaintiffs cite to their Exhibit 28 (Docket No. 108-30), pages 134-137 in support of ¶ 59, but Exhibit 28 only has one page; 66. And they refer to ¶ 24 of their OSUMF-1 for their support to ¶ 60 of their OSUMF-1, yet the support for ¶ 24 has nothing to do with what is asserted in ¶ 60. Consequently, the statement is deemed admitted.

October 16, 2012, they visited UPS's facilities, interviewing Polanco, Rosario, Santos, Bernardi, and Carmona.  SUMF-2 at ¶¶ 44-46.  During the course of the investigation, Escudero was moved to a different location, so as to avoid contact with Rosario. OSUMF-2 at ¶ 9; Docket No. 120-2 at ¶ 9.[26]  After concluding the investigation Olivero prepared a report, stating a number of individuals had corroborated that Rosario claimed there had been some sort of sexual contact between Escudero and the truck driver, but the alleged contact had not occurred.  SUMF-2 at ¶¶ 47 and 48; Docket No. 120-2, Exh. I.

Warren and Fleming decided to discipline Rosario.   SUMF-2 at ¶ 51.[27]  His prior disciplinary history was examined, including the fact he had been disciplined for improper comments and had been demoted twice during the course of his employment with UPS.  SUMF-2 at ¶ 50.  And thus, he was issued a final warning letter; his MIP (a year-end bonus in company stock) was eliminated; he was downgraded in terms of the Sales Incentive Program payout to that of local sales account executive.  Furthermore, he would no longer be the lead salesperson, and was instructed to "office" outside of the place of business.  SUMF-1 at ¶ 134 and SUMF-2 at ¶ 49.[28]  Mackey, Rosario's supervisor, traveled to Puerto Rico to inform Rosario of the disciplinary

---

[26] UW made this decision "to protect her" (Docket No. 120-2 at ¶¶ 9 and 17).

[27] Plaintiffs "denied as drafted" the statement because according to them "Mackey played a role in the decision" to discipline Rosario (Docket No. 113-2 at ¶ 51).  Plaintiffs have not properly controverted the statement since their reference to the record merely establishes that Mackey provided his input as to the matter and signed the disciplinary action, which does not controvert that Warren and Fleming were the ultimate decision makers.

[28] The cancellation of the MIP was significant, because the annual stock grant represented a substantial amount of money.  SUMF-2 at ¶ 49.

action.  SUMF-2 at ¶ 52.  The work environment improved from that point on.  SUMF-2 at ¶ 53.[29]

After August 27, 2012, Rosario never again addressed Escudero directly.  SUMF-2 at ¶ 54.[30]

### f.  Escudero's EEOC Charge and Rosario's Subsequent Behavior

On December 13, 2012, Escudero filed a charge with the Equal Employment Opportunity Commission.  SUMF-2 at ¶ 56.  About four months later, Rosario arrived at the office one day, exclaiming: "Nobody will get me out of here.  Nobody will get me out of here.  I will leave here when I want to.  Nobody will get me out of here."  SUMF-2 at ¶ 56.  Two or three weeks later, he saw certain EEOC posters in the office, and stated that he was untouchable and nobody would get him out of there.  SUMF-2 at ¶ 57.  On another occasion, while standing in the reception area speaking to the receptionist, he remarked, "Samuel, how sad is it when somebody says something about you and you have to live with that because you cannot do anything about it."  SUMF-2 at ¶ 58.

Escudero reported these incidents to Bernardi, who in turn, told her to keep doing a good job so Rosario would not have an excuse to request that she be removed from the office.  SUMF-2 at ¶ 59.  After being served with copy of the Complaint, Rosario exclaimed, "Here I am, and I

---

[29] Plaintiffs "denied as drafted" this statement because according to them the environment improved when Rosario finally retired (Docket No. 113-2 at ¶ 52).  However, their reference to the record does not controvert that the work environment did improve while Rosario was not at the office after his access to the office was restricted, although it improved even more when he retired.  As such the statement is admitted.

[30] Plaintiffs "denied as drafted" this statement, stating that Rosario "screamed about his disciplinary consequences, hit wooden panes, and violently threatened he was untouchable, all after the incident with Escudero was investigated" (Docket No. 113-2 at ¶ 54).  In support, they refer to OSUMF-2 at ¶¶ 4, 7, and 12.  The facts included in those paragraphs are not entirely supported by the record, and even the paragraphs themselves taken at face value do not controvert paragraph 54 of the SUMF-2, as they merely state that Rosario "would converse with Orlando Santos;" that he "reacted violently in front of co-workers;" and that "he would scream" in the office.  None of this controverts that he never again addressed Escudero directly.  As such the statement is admitted.  UPS added that once, Rosario was speaking to two UW employees in the office, and Escudero overheard him say that he had visited a "whorehouse in Europe."  SUMF-2 at ¶ 55.  Plaintiffs "denied as drafted" this statement, stating that "Rosario was standing behind her cubicle, in the hallway" (Docket No. 113-2 at ¶ 55).  In support, they refer to OSUMF-2 at ¶ 4.  However, the facts included in said paragraphs have nothing to do with, and in no way controvert the statement.  Furthermore, that "Rosario [might have been] standing behind her cubicle" does not controvert the statement.  Rather, it validates it as it explains why she could have overhead it.  As such, the statement is admitted.

will be here whenever I want to."  SUMF-2 at ¶ 61.  Escudero has continued her employment to this day, and has not seen Rosario or had any interaction with him since March 7, 2014.  SUMF-2 at ¶ 63.[31]

### g.  Polanco's Employment with UPS

Polanco worked with UW between 2005 and the summer of 2008.  SUMF-1 at ¶ 15.  While at UW, she serviced the UPS account as a customer service employee, becoming familiar with the UPS business.  SUMF-1 at ¶ 15.  In 2008, UPS hired her as Operations Supervisor.  SUMF-1 at ¶ 16.  She was the only Operations Supervisor in Puerto Rico.  SUMF-1 at ¶ 89.  Mackey made the decision to hire her.  SUMF-1 at ¶ 16.  From late 2008 until the end of her employment at UPS, Polanco reported to Shearer.  SUMF-1 at ¶ 17.

As Operations Supervisor, Polanco did not hire UW employees, evaluate them, issue written warnings, suspend or terminate UW employees, prepare their work schedules, or make recommendations about their salaries, bonuses or compensation.  SUMF-2 at ¶ 12.[32]  She was primarily responsible for overseeing the operations aspects of the business, ensuring that: (1) shipments were loaded correctly; (2) paperwork was completed correctly; (3) southbound shipments were delivered to customers; (4) packages were properly measured; and (5) correct equipment was used to load containers.  SUMF-1 at ¶¶ 18 and 19.

---

[31] Defendant had phrased the statement as follows: "Escudero has continued to work at the same exact place until this day . . ." and plaintiffs denied it as drafted because UW had moved its facilities to a new location (Docket No. 113-2 at ¶ 63).  This does not create an issue of material fact, as both parties agree that Escudero has continued her same employment to this day.  Plaintiffs added that Escudero "is still a UW dedicated UPS employee," but did not provide any record citation in support of their contention (Docket No. 113-2 at ¶ 63).

[32] The parties dispute, however, whether Polanco supervised the employees of UW that worked only at UPS.  Polanco alleges she did, but UPS disputes it.  See OSUMF-1 at ¶¶ 23 and 37; Docket No. 108-38 at ¶ 3 (Escudero's statement under penalty of perjury stating that Polanco was her immediate supervisor); and Docket No. 118-2 at ¶¶ 23 and 37.

When Polanco began to work for UPS, she traveled to the hub in Harrisburg, Pennsylvania for on-the-job training with Shearer.  SUMF-1 at ¶ 20.  Among other things, she was trained on volume calculation, learning how to load containers, measure shipments, and enter package volumes into the UPS system.  SUMF-1 at ¶ 20;[33] Docket No. 108-2 at ¶ 20; Docket No. 118-2 at ¶ 52.  Shearer observed Polanco prepare 15 or 20 bills, performing volume calculation in the proper sequence, and concluded she was proficient in performing her tasks.  SUMF-1 at ¶ 21.[34]  Other than the training she received at the beginning of her employment, Polanco was never again trained as to volume calculation because it was a "simple task" that "she knew how to perform."  OSUMF-1 at ¶ 52; Docket No. 118-2 at ¶ 52.  Polanco received an incentive bonus based on sales and operations as part of her compensation.  SUMF-1 at ¶ 22.[35]  About 25% of her compensation was incentive related.  SUMF-1 at ¶ 22.  There was a minimum she had to meet on a quarterly basis to receive the incentive. SUMF-1 at ¶ 23.  Additionally, the more that was sold, the better the bonus that she would receive. SUMF-1 at ¶ 23.[36]

### h.  Preparation of Shipping Documents

Generally, in order to place a shipment through UPS, a customer must prepare a Bill of Lading ("BOL"), describing the characteristics of the item the customer intends to ship, such as weight, shipment description, and shipper's and consignee's names and address. SUMF-1 at ¶ 24.

---

[33] Plaintiffs' qualifications do not contest these facts.  Their qualifications are devoted to including facts as to Marxuach that in no way controvert statement no. 20.  In addition, although plaintiffs claim that Polanco was trained by Marxuach, their reference to the record does not support their statement.  Rather, it supports defendant's statement No. 20.  See, SUMF-1 at ¶ 20; Docket No. 108-2 at ¶ 20; and Docket No. 118-2 at ¶ 52.

[34] Plaintiffs conclusorily denied this statement "as drafted," but failed to properly controvert the facts included therein (Docket No. 108-2 at ¶ 21).

[35] Plaintiffs denied this statement "as drafted," but their references to the record do not controvert it (Docket No. 108-2 at ¶ 22).

[36] Plaintiffs denied this statement "as drafted," but their references to the record confirm, rather than controvert the fact (Docket No. 108-2 at ¶ 23).

Data from the BOL is entered in the UPS system by billing personnel. SUMF-1 at ¶ 24.  Based on that information, two other documents are prepared: the invoice (which is used to bill the customer), and the manifest (which provides information on every package that will be shipped together in the same freight container).  SUMF-1 at ¶ 25.[37]  The manifest contains the volume and weight of each package, among other items.  SUMF-1 at ¶ 25.  To generate the document, the volume of each package must be measured.  SUMF-1 at ¶ 25.  All shipment documents are filed once the ship has sailed.  SUMF-1 at ¶ 26.

### i.  Calculation of Volume and Cube Utilization

First, if someone in Puerto Rico decides to ship a package through UPS, a UW driver would pick up the package and BOL, and take them to the warehouse.  SUMF-1 at ¶ 27.  Then, the condition of the package is verified and the package measured and weighed by Calvin Smith and/or Miguel Suárez.  SUMF-1 at ¶ 27.[38]  The measurements are written on a piece of paper along with the amount of boxes or pallets in the shipment, and the paper is attached to the BOL.  SUMF-1 at ¶ 27.[39]

Second, the notes prepared by Smith and Suárez contain three measurements in inches: height, length and width.  SUMF-1 at ¶ 28.  To measure the shipment, UPS guides itself by the footprint of the wooden palette on which the item is placed, measuring the length of the palette, the highest point of the item, and the widest point of the item.  SUMF-1 at ¶ 29.  If a shipment has,

---

[37] Although plaintiffs denied this statement "as drafted," they refer to eight different statements included in their OSUMF-1, which in turn cite to multiple exhibits and depositions, without specifically pointing out where in those pages there is support for the opposition (Docket No. 108-2 at ¶ 25).  The court's review of all these materials reflect that the record does not controvert the statement.

[38] Smith and Suárez are UW employees.

[39] The record citation in support of plaintiffs' clarification does not support the same, nor does it controvert defendant's statement (Docket No. 108-2 at ¶ 27).

for example, a pole sticking out, the measurement will be made to the top of that pole.  SUMF-1 at ¶ 28.  This yields the footprint used to calculate the volume, which is calculated in a sense as a cube, even if the item is not a cube.  SUMF-1 at ¶ 29.[40]  Thus, dedicated space -- the area of a container that cannot be used due to a certain package having an irregular shape (such as a pole sticking out) -- is considered in that calculation.  SUMF-1 at ¶ 30.[41]

Third, Joseline, who is in charge of working on northbound paperwork, multiplies the three measurements and, using the same piece of paper used by Smith or Suárez, writes down the total volume, which in turn is recorded in cubic feet.  SUMF-1 at ¶ 31.[42]  She divides the total by 1,728, the measurement in inches of one cubic foot.  SUMF-1 at ¶ 31.  If the number obtained contains a decimal, it would be rounded to the next whole number, always rounding up, not down. SUMF-1 at ¶ 32.  These numbers are registered in the computer system in order to produce the manifest, which, among other things, contains the container's cube utilization.  SUMF-1 at ¶ 33.[43]

Fourth, after the manifest is prepared, Polanco, as Operations Supervisor, would review the northbound documentation to make sure no information is left out.  SUMF-1 at ¶ 35.  According to her, she would modify the volume calculations in the manifest whenever necessary.  SUMF-1 at ¶ 35.  In order to change the volume of a package, the employee would have to show that the actual volume of the shipment does not correspond to the volume of the shipment the customer

---

[40] While plaintiffs denied part of this statement "as drafted," their reference to the record does not controvert it.  They mostly cite to the same deposition excerpts as defendant, which in fact corroborate the statement (Docket No. 108-2 at ¶ 29).

[41] Plaintiffs denied part of this statement "as drafted," but their reference to the record does not controvert it (Docket No. 108-2 at ¶ 30).

[42] Plaintiffs "admit[ted] in part, denied in part" this statement.  However, they failed to cite to anything in support of their contention (Docket No. 108-2 at ¶ 31).  Thus, the statement is deemed admitted.

[43] Cube utilization refers to the percentage of volume used in each container shipped. If 20 shipments of fifty cubic feet each are placed together in a container which has 2,500 cubic feet of space, the cube utilization is of 40%, since the 20 shipments total 1,000 cubic feet.  SUMF-1 at ¶ 34.  Although plaintiffs denied this statement "as drafted," their reference to the record does not controvert it.  They mostly cite to the same deposition excerpts as defendant, which in fact corroborate the statement.  The rest of the documents plaintiffs cited in support of their position does not controverts the statement (Docket No. 108-2 at ¶ 34).

informed.  SUMF-1 at ¶ 36.[44]  Around 80% of UPS's shipments are rated on volume.  SUMF-1 at

¶ 37.[45]  The rate UPS bills depends on various factors, including package dimensions.  SUMF-1 at

¶ 37.

### j.   Investigation as to Cube Utilization

In or around the beginning of November 2012, Joseline approached Carmona, showing her

a document related to northbound cargo.  SUMF-1 at ¶ 38.  She had two copies of the same

manifest with her: the original one with the information as Joseline had prepared it; and a copy

altered by Polanco.  SUMF-1 at ¶ 39.[46]  She complained that (1) Polanco was changing the cube

utilization and volume of shipments in the northbound manifests; (2) as a matter of course, when

she received copy of the manifest from Polanco, she would be instructed to change the original;

(3) she would give Polanco the completed manifest for her revision; and (4) Polanco would return

it to her with the changes, instructing Joseline to inflate the numbers.  SUMF-1 at ¶¶ 40 and 41.

Carmona relayed this information to Bernardi, who instructed Joseline to keep the originals

and prepare a log.  SUMF-1 at ¶ 42.  Bernardi informed Rodríguez, who contacted Mackey, telling

him that Joseline had brought to him a concern about Polanco's changing shipment measurements.

SUMF-1 at ¶¶ 42.[47]  In due course, Joseline explained to Mackey how the alterations were being

made, and provided him with a sample of the documents that had been changed; and a manifest

including about ten shipments with changes, most of them to measurements ending in zero.

---

[44] Although plaintiffs denied this statement, their reference to the record does not controvert it.  Plaintiffs cite to a deposition except that discusses the definition of "beautiful freight" and "bad freight," that in no way controverts the statement (Docket No. 108-2 at ¶ 36).

[45] Plaintiffs "denied in part" this statement, but their reference to the record does not controvert it (Docket No. 108-2 at ¶ 37).

[46] Plaintiffs' qualification does not contest this fact.  They refer to OSUMF-1 at ¶¶ 6 and 37, which in no way controvert the statement (Docket No. 108-2 at ¶ 39).

[47] Plaintiffs' clarifications that "Mackey was made aware" of the situation by Rodríguez, who was "concerned about his integrity as an agent," and regarding who delegated the investigation about Polanco do not controvert this fact (Docket No. 108-2 at ¶¶ 42 and 44).

SUMF-1 at ¶¶ 45, 46 and 47.  The changes were not to simply round up, because Polanco would also change the first digit.  SUMF-1 at ¶ 47.  No justification for the changes existed in the shipments documentation, even though changes required a note either in the system or in the hard-copy file indicating why the change was made.  SUMF-1 at ¶¶ 48[48] and 50.[49]

Mackey and Rodríguez met with Smith, and asked him to explain the process he followed to measure shipments.  Further, they inquired if Polanco had ever requested him to change a measurement of a shipment, to which he responded in the negative.  SUMF-1 at ¶ 49.  Mackey verified shipments on the computer systems to see if there were notes explaining the rationale for changes, but found none.  SUMF-1 at ¶ 50.  He sent an email to Fleming and Warren, informing them that changes to volume and some document falsification were taking place in the Puerto Rico terminal.  SUMF-1 at ¶ 51.  Fleming and Warren concluded the allegations had to be investigated, and delegated this duty to Shearer and Mackey, who traveled to Puerto Rico to conduct interviews. SUMF-1 at ¶ 52.[50]

On November 28, 2012, Shearer and Mackey interviewed Polanco. SUMF-1 at ¶ 53.[51]  She stated that modifications were done as a matter of normal business practice as she had been trained to do, but admitted to Mackey she had been doing something wrong. SUMF-1 at ¶¶ 53 and 54.  Given that Polanco had stated in her interview that she received instructions from Marxuach to modify the volume of shipments, Mackey and Shearer interviewed Marxuach.  SUMF-1 at ¶ 55.

---

[48] Plaintiffs' clarifications regarding where comments about adjustment could be made does not controvert the fact that no comments were actually made regarding these adjustments (Docket No. 108-2 at ¶ 48).

[49] Plaintiffs' OSUMF-1 at ¶ 43 does not controvert this fact.

[50] Plaintiffs' clarification that "Shearer was not there at the first meeting with Polanco" (Docket No. 108-2 at ¶ 52) does not controvert this fact.

[51] Plaintiffs' clarification that "it was Mackey who handled the process of investigation with his superiors" (Docket No. 108-2 at ¶ 53) does not controvert the fact that both Shearer and Mackay interviewed Polanco.

Marxuach, however, denied ever instructing employee(s) to falsify cube measurements, and stated that she was completely unaware of falsifications ever occurring.  SUMF-1 at ¶ 55.[52]  Santos was interviewed, denying that changes to volume and cube utilization were past practice.  SUMF-1 at ¶ 56.

Mackey and Shearer reviewed additional containers to determine if there was a pattern in the modification of volume and cube utilization.  SUMF-1 at ¶ 57.  To that extent, they reviewed containers loaded: (1) during the time when Polanco was the Operations Supervisor; (2) while Marxuach was the Operations Supervisor, prior to Polanco's appointment as supervisor; (3) while Polanco was present, before her maternity leave; (4) while Polanco was out on maternity leave; and (5) by Polanco after she returned from maternity leave.  SUMF-1 at ¶¶ 58-60.  Likewise, they reviewed a sample of containers prepared by Curvello, who was the northbound clerk while Polanco was the Operations Supervisor and had completed some of the volume calculations.  SUMF-1 at ¶ 61.

Container files Polanco prepared revealed she had increased the volume in more than 70% of the packages.  SUMF-1 at ¶ 69.  Most of the changes were in numbers ending in zero.  SUMF-1 at ¶ 69.  For example, Polanco altered the volume of a package from 82 cubic feet to 100 cubic feet, from 471 cubic feet to 500 cubic feet, and from 10 to 20 cubic feet, SUMF-1 at ¶¶ 71 and 73, but claimed the volume she added was the space in the container that could not be used because of the shape of that particular shipment.  SUMF-1 at ¶ 68.

Mackey and Shearer were unable to identify explanations either in the container files or in the UPS system to most of the changes that Polanco had made.  SUMF-1 at ¶¶ 70 and 74.  Shearer, who had never conducted an investigation of volume adjustments like the one he conducted on

---

[52] Plaintiffs' clarification that "Marxuach trained Polanco" (Docket No. 108-2 at ¶ 53) does not controvert this fact.

Polanco, thought Polanco was falsifying documents.  SUMF-1 at ¶¶ 44[53] and 62.[54]  In the end, the

investigation concluded this was a pattern, not a one-time event, and that there was no proof it was

a prior practice before Polanco became the Operations Supervisor.  SUMF-1 at ¶ 66.[55]

### k. Polanco's Termination

After concluding the investigation, Mackey presented his findings to Warren and Fleming,

who reviewed and discussed them.  SUMF-1 at ¶¶ 64, 75 and 76.[56]  No determination was made

as to what had been Polanco's financial gain in the form of incentives received by the increase in

volume.  OSUMF-1 at ¶ 50.  Nevertheless, upon reviewing the investigation's findings, and based

on Joseline's, Marxuach's, and Santos' statements, Warren and Fleming believed that:  (1) Polanco

was falsifying documents for her financial benefit; (2) her actions could not be considered a past

practice in the Puerto Rico terminal; and (3) she had violated the integrity policy.  SUMF-1 at

¶ 79.  So they concluded that Polanco had to be terminated.  SUMF-1 at ¶ 80.  Shearer, Polanco's

direct supervisor, thought Polanco was a good supervisor and did not recall giving Polanco a "letter

of warning."  OSUMF-1 at ¶ 15.  He communicated to UPS that he thought terminating Polanco's

employment "was severe," but it was not his decision to make.  OSUMF-1 at ¶ 73.

On December 8, 2012, Mackey and Shearer traveled to Puerto Rico and met with Polanco

to inform her of the decision to terminate her employment.  SUMF-1 at ¶ 84.  Santos was named

---

[53] Q:   You as, as operations supervisor, have you ever conducted a similar investigation?
     A:   Never.

[54] Plaintiffs' clarification that "Shearer had never conducted an investigation like the one for Polanco" (Docket No. 108-2 at ¶ 62) does not controvert this statement.

[55] Plaintiffs' clarification that Mackey concluded ". . .the changes made by Polanco to cubic measurements, absent notes justifying the adjustments, were a violation of UPS FS Honesty and Integrity Policy" (Docket No. 108-2 at ¶ 66) does not controvert the statement.

[56] Plaintiffs denied this statement "as drafted," but failed to support their position with references to the record.  Although they cited to OSUMF-1 ¶ 50, which in turns cites to Docket No. 108, Exh. 24 at pp. 48-50, the exhibit does not contain the referenced pages.  Therefore, the statement is admitted.

Operations Supervisor for Puerto Rico.  SUMF-1 at ¶ 85.  Polanco was aware of UPS's policy on

integrity and, on January 13, 2012, had acknowledged receipt of UPS's Honesty in Employment

Policy. SUMF-1 at ¶ 81.

## IV.   <u>DISCUSSION</u>

### A. <u>Polanco</u>

#### 1.  **Title VII**

##### i.  **Discrimination**

Polanco alleges UPS terminated her employment because of her sex and national origin in

violation of Title VII (Docket No. 31).  She has not presented direct evidence of discrimination.

However, a plaintiff may demonstrate discrimination under Title VII availing herself of the burden-

shifting framework articulated in <u>McDonnell Douglas Corp.</u> v. <u>Green</u>, 411 U.S. 792 (1973), and/or

by relying on the mixed-motives theory of discrimination initially announced in <u>Price Waterhouse</u>

v. <u>Hopkins</u>, 490 U.S. 228 (1989)(plurality opinion) and subsequently codified by the Civil Rights

Act of 1991 at 42 U.S.C. § 2000e-2(m).  <u>See</u>, <u>Burns</u> v. <u>Johnson</u>, 829 F.3d 1, 8-9 & n.9 (1st Cir.

2016) (explaining methods of proof).  Under both approaches, plaintiff must present enough

evidence to permit a finding that there was differential treatment in connection with an adverse

employment action, and that the challenged decision was caused at least in part by a forbidden

type of bias.  <u>Id.</u>

As to <u>McDonnell Douglas</u>, plaintiff must first establish a *prima facie* case by showing that:

(1) she belonged to a protected class; (2) she performed her job satisfactorily; (3) her employer

took an adverse employment decision against her; and (4) her employer continued to have her

duties performed by a comparably qualified person.  <u>Burns</u>, 829 F.3d at 9 & n.8.  If the plaintiff

succeeds in establishing a *prima facie* case, the presumption arises that the employer unlawfully

discriminated against plaintiff, shifting to the employer the burden of articulating a legitimate, nondiscriminatory reason for the adverse employment action.  Benoit v. Technical Mfg. Corp., 331 F.3d 166, 174 (1st Cir. 2003); Champagne v. Servistar Corp., 138 F.3d 7, 12 (1st Cir. 1998).

If the defendant is successful in satisfying its burden, plaintiff no longer can rest on the initial inference of discrimination.  Bennett v. Saint-Gobain Corp., 507 F.3d 23, 31 (1st Cir. 2007).  The inference raised by the *prima facie* case dissolves, and the last transfer of burdens occurs.  Mesnick v. General Electric, 950 F.2d 816, 823 (1st Cir. 1991), cert. denied 504 U.S. 985 (1992).  In that case, the burden shifts back to the plaintiff to show that the reason proffered was a pretext concealing unlawful discrimination of the type alleged.  Rodríguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 19 (1st Cir. 1999); Mesnick, 950 F.2d at 823.

At this stage, the plaintiff's burden of producing evidence to rebut the employer's stated reason for its employment action merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination.  Feliciano de la Cruz v. El Conquistador Resort and Country Club, 218 F.3d 1, 6 (1st Cir. 2000); Vélez v. Thermo King de Puerto Rico, Inc., 585 F.3d 441, 447 (1st Cir. 2009).  The same evidence used to show pretext can support a finding of discriminatory animus if it enables a factfinder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action.  Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000).  The ultimate question is not whether the employer's explanation was false, but whether discrimination was the cause of the termination.  Zapata-Matos v. Reckitt & Coleman, Inc., 277 F.3d 40, 45 (1st Cir. 2002).

The mixed-motives framework applies in cases where multiple motives lie behind an adverse employment action.  Burns, 829 F.3d at 9 & n.9.  In this way, it allows a plaintiff to establish an unlawful employment practice by demonstrating that sex or national origin was a

motivating factor for any employment practice, even though other factors also motivated the practice.  Id. (quoting, 42 U.S.C. § 2000e–2(m)).  Once a plaintiff shows the existence of an impermissible motivating factor, the employer has a limited affirmative defense that does not absolve it of liability, but restricts the remedies available to a plaintiff.  Id. (quoting, Desert Palace v. Costa, 539 U.S. 90, 94 (2003)).

A court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the *prima facie* case.  Vélez, 585 F.3d at 448. Therefore, UPS assumes for purposes of summary judgment that Polanco has successfully established a *prima facie* case of sex and national origin discrimination under McDonnell Douglas. See, Docket No. 106-1 at p. 5.  But it states Polanco violated UPS's Honest Policy falsifying documents for her financial benefit, by altering package volumes and cube utilizations.  Id. at p. 7; Docket No. 118-1 at p. 31.

Such violations are legitimate non-discriminatory grounds for its decision to terminate Polanco's employment.  See, Rivas-Rosado v. Radio Shack, Inc., 312 F.3d 532, 534 (1st Cir. 2002)(departures from normal company procedure, a number of which appeared to work to plaintiff's benefit such as falsifying records to earn higher commissions, acknowledged as valid, nondiscriminatory reasons for termination); Klein v. Great Atlantic & Pacific Tea Co., 1997 WL 336222, *1, *3 (5th Cir. June 3, 1997)(plaintiff's failure to comply with employer's inventory policy deemed legitimate ground for discharge); Vélez, 585 F.3d at 448 (violating company's code of conduct and profiting financially from sale of employer property considered legitimate, non-discriminatory reasons for termination of plaintiff's employment).  And thus the case moves to the third stage of analysis.

Pretext analysis is more demanding than the assessment of whether a *prima facie* case has been established, moving the inquiry to a new level of specificity.  Mariani-Colón v. Department of Homeland Security ex rel. Chertoff, 511 F.3d 216, 222 (1st Cir. 2007); Kosereis v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003).  It is not enough for a plaintiff merely to impugn the veracity of the employer's justification.  Meléndez v. Autogermana, Inc., 622 F.3d 46, 52 (1st Cir. 2010); Morgan v. Massachusetts General Hosp., 901 F.2d 186, 191 (1st Cir. 1990); Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

A plaintiff must produce evidence that the employer did more than get it wrong.  Johnson v. Weld County, Colo., 594 F.3d 1202, 1211 (10th Cir. 2010).  She must elucidate specific facts which would enable a jury to find that the reason given for the employer's action –in this case, Polanco's altering package volumes and cube utilizations– is a lie intended to cover up the employer's real motive: Polanco's sex or national origin.  Collazo-Rosado, 765 F.3d at 92; Meléndez, 622 F.3d at 52; Mesnick, 950 F.2d at 824.  The factfinder must believe the plaintiff's explanation of intentional discrimination.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 519 (1993).

From these parameters, Polanco asserts UPS had trained her on volume calculation at the beginning of her employment, but never again retrained or audited her, and that she was performing her functions as instructed (Docket No. 108 at pp. 13-14).  She avers the practice continues but UPS has not treated other employees in similar circumstances the same way it treated her (Docket No. 108-1 at p. 4; Docket No. 108-2 at p. 2).  Similarly, she maintains that Rosario, who was also the subject of an investigation, was treated much more favorably than she was treated (Docket No. 108-1 at p. 4; Docket No. 108-2 at p. 8).  She complains that he was only demoted despite having been involved in prior disciplinary proceedings and been found to have violated company policies.

Id. at pp. 14-15.  Yet she points out she was terminated for a first and only violation even though she was described as a "good supervisor" by Shearer, her direct supervisor, and over her supervisor's opinion that termination was a severe punishment.  Id.  Finally, she accuses UPS of not providing her with an opportunity to defend from the accusations lodged against her (Docket No. 106-2 at p. 18).

UPS responds that "all of these issues have reasonable explanations" rebutting Polanco's allegations (Docket No. 106-1 at p. 11).  It alleges that even though disciplinary measures taken against Rosario were less harsh than the one imposed on Polanco, these employees were not similarly situated (Docket No. 118 at pp. 5-10; Docket No. 120-2 at pp. 15-17).  Further, it claims there is no way Polanco can assert that the allegedly fraudulent adjustment is ongoing "and/or if the[…] adjustments are warranted or not."  Id.  And it says Polanco was afforded an opportunity to respond to the accusation that led to termination.  Id. at p. 19.[57]

An employer's disparate treatment of employees in response to behavior that legitimately offends the employer can provide evidence of discriminatory animus.  See, Straughn v. Delta Airlines, 250 F.3d 23, 37 (1st Cir. 2001)(so recognizing); Vélez, 585 F.3d at 451 (same)(quoting McDonald v. Santa Fe, 427 U.S. 273, 283 (1976)).  But in order to be probative of discriminatory animus, a claim of disparate treatment must rest on proof that the proposed analogue is similarly situated in material respects.  Ray v. Ropes & Gray, 799 F.3d 99, 114 (1st Cir. 2015); Rodríguez-Cuervos, 181 F.3d at 20-21.  Plaintiff bears the burden of showing that the individuals with whom she seeks to be compared "have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  Rodríguez-Cuervos, 181 F.3d at 21.  And

---

[57] The record shows Polanco was given such an opportunity, and brought forth her side of the story.

therefore, the test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.  Darmouth Review v. Darmouth College, 889 F.2d 13, 19 (1st Cir. 1989).  For comparative purposes, Polanco basically directs the court's attention to two employees: Rosario and her successor (Santos).

First, she alleges UPS illegally treated Rosario more leniently than it treated her.   In response, UPS points out that: (1) Polanco's behavior compromised "integrity" whereas Rosario's behavior did not; (2) Polanco's conduct caused customers to overpay for shipments while Rosario's conduct did not impact customers in any way; and (3) Polanco obtained a personal financial gain from her conduct while Rosario's conduct represented no personal financial gain for himself (Docket No. 120-2 at pp. 16-17).

On these facts, it is apparent Polanco was not similarly situated to Rosario.  See, Rivas-Rosado, 312 F.3d at 534 (rejecting differential treatment argument in part because contrary to plaintiff, purported comparators did not benefit personally from irregularities leading to plaintiff's termination).[58]   Different people may have different views on whether the problems involving these two employees warrant the same disciplinary measure, and to that end, whether behavior like Rosario's, linked to sexually inappropriate comments, should be on the same footing as the integrity violations attributed to Polanco.  But that is up to the employer.  Courts may not sit as super personnel departments, assessing the merits of an employer's business decisions.  See, Mesnick, 950 F.2d at 825 (so acknowledging).[59]

---

[58] See also, Cardona Jiménez v. Bancomercio, 174 F.3d 36, 42 (1st Cir. 1999)(concluding that plaintiff's and comparator's roles were not sufficiently equivalent to justify a finding of pretext); Ray, 799 F.3d at 114-115 (analyzing insufficiency of evidence presented to establish differential treatment in connection with pretext); Straughn, 250 F.3d at 37-38 (same).

[59] Polanco asserts that Marxuach –a woman– had been demoted from a Sales Manager position in 2008 and the position given to a male (Docket No. 106-1 at p. 13).  UPS counters the reason Marxuach was demoted was because with the creation of the Operations Supervisor position that was given to Polanco, some of the responsibilities as Sales Manager were given to the Operations Supervisor, which eliminated the need for a Sales Manager in the territory.  Id.  Whatever happened to Marxuach's position and demotion in 2008 is inconsequential to show pretext in connection with Polanco's termination three or four years later.  See, Birkbel

Second, relying on Escudero statement, Polanco argues that the "integrity" issue leading to her termination continues in Puerto Rico but no employee, including her successor (Santos), has been disciplined (much less terminated) (Docket No. 108-2 at ¶ 56).  UPS counters that Polanco is in no position to so assert because Escudero's statement: (1) is a "conclusory self-serving statement which should be disregarded by the Court" (Docket No. 118-2 at p. 7); and (2) does not reveal how Escudero came across this knowledge. Id. at p. 8.  Also, it asserts that: (1) no one has brought to the attention of management that unjustified adjustments such as those made by Polanco are still made, id. at p. 9; and (2) Mackey reviewed container files for February, March, and April 2016, and did not find evidence that unjustified adjustments to volume continue to occur.  Id.  Lastly, it directs the court to Rodríguez' deposition testimony, to the effect that Polanco's was "the first time this type of alternation was ever brought to his attention" (Docket No. 106-2 at ¶ 43).

It is true –at least it has not been disputed– that Mackey reviewed three months of container files in 2016 without evidence of "unjustified" adjustments (Docket No. 118-15 at ¶ 27).  Nonetheless, his statement does not explain the meaning of "unjustified," and one of Escudero's statements dates back to August 2013 (Docket No. 108-37).  In this sense, Escudero asserts that "[a]djusting cubic area for invoice purposes is a general practice at UPS in certain specific cases of certain cargo, not wrongful practice . . . it is still done by [Polanco's] successor and management knows and accepts it as of today" ("Statement under Penalty of Perjury," Docket No. 108-37 at ¶ 3).  And she claims to "know this personally."  Id. at ¶ 4.  She states that is so because "as customer service representative … [she] met with request for adjustments of volume and thus invoices from Jacksonville by individual clients who exercise the right to claim" (Statement under Penalty of

v. Marvel Lighting Corp., 30 F.3d 507, 512 (4th Cir. 1994)(finding that discriminatory comment made two years prior to discharge was not evidence of discrimination); Phelps v. Yale Sec., Inc., 986 F.2d 1020, 1026 (6th Cir.), cert. denied, 510 U.S. 861 (1993)(holding that statements made almost a year before layoff were too far removed to have influenced decision in question).

Joanna Polanco, et al. v. UPS Freight Services, Inc., et al.
Civil No. 13-1921 (PAD)
Opinion and Order
Page 29

Perjury," Docket No. 108-38 at ¶ 6).[60]

If Escudero's assertion were true (and the court must accept it as true for purposes of Fed. R. Civ. P. 56 despite the statement's somewhat ambiguous foundation), Polanco's male successor (Santos) has received a more favorable treatment than she.[61] Were it so, the facts would suffice to establish pretext. See, Windross v. Barton Protective Services, Inc., 586 F.3d 98, 104 (1st Cir. 2009)(holding that plaintiff shows pretext by demonstrating similarly situated employees outside of his protected class were treated differently); McDonnell Douglas, 411 U.S. at 804 (recognizing that "especially relevant" to a showing of pretext is whether the defendant treated others outside of the protected group in comparable situations like it treated plaintiff). Which version more accurately reflects reality ultimately requires credibility judgments that are properly the task of a jury. See, Ahmed v. Johnson, 752 F.3d 490, 502 (1st Cir. 2014)(so noting).

That said, the record does not lead to a similar conclusion regarding Polanco's national origin discrimination claim. Polanco was born in Hartford, Connecticut, but claims Shearer considered her Puerto Rican because she was based in Puerto Rico. SUMF-1 at ¶ 88. All other employees reporting to Shearer were located in the mainland U.S. SUMF-1 at ¶ 89. Polanco does

---

[60] Having presumably received copy of Escudero's 2013 statement as part of this litigation, UPS has not stated that it investigated what she asserts in the statement, other than (perhaps), through Mackey's review of container files for a three-month period approximately three years later, in 2016. In that regard, UPS asserts that (1) Escudero's responsibilities entail notification of customers when their shipments are ready for pick-up and for tax-related issues; and (2) at no point Escudero reviews, manages or handles container files, and thus, does not know what the actual measurements of packages are, and if those measurements correspond to the volume noted in the Load Manifests (Docket No. 118-2 at pp. 9-9). Furthermore, it states that (1) the only instance in which Escudero might be involved in volumes is if a customer disputes a charge, stating that he or she was quoted for less; (2) in those cases, she has to refer the matter to Santos; and (3) this does not mean that volume was falsified or even adjusted. Id. at p. 9. Even though it is close to the line, from a factual standpoint the issue is not so clear as to justify summary judgment. Escudero's assertion may be rationally related to her perception of events. See, Fed. R. Evid. 701(a)(permitting opinion testimony by lay witnesses under those circumstances, where it is helpful to determining a fact in issue and is not based on scientific, technical, or other specialized knowledge within the scope of Fed. R. Evid. 702). Thus, a jury must sort out the precise basis and extent of Escudero's knowledge, and gauge it against UPS's description with the benefit of UPS's evidence and cross-examination, to determine whether measurements such as those resulting in Polanco's termination exist or existed with Santos' acquiescence.

[61] With regard to Rodríguez, he testified that his company (UW) does not review random samples to verify whether "the practice" is ongoing (Docket No. 106-5 at p. 82, lines 12-15), and he is not going to check unless anybody "starts or complains" because that is UPS's responsibility. Id. at p. 82, lines 12-19. Rodríguez' assertion does not neutralize Escudero's statement.

not, however, know where they were born.  SUMF-1 at ¶ 89.  Still, she alleges Shearer supervised

her more closely than he supervised people in the U.S., and that cameras had to be used regarding

shipments in Puerto Rico.

Viewed in light most favorable to Polanco, what she has brought forth is not enough to

sustain a national-origin discrimination claim.  See, Gómez-Pérez, 452 Fed.Appx. at 8 (extreme

supervision and snubbing insufficient to support discrimination claim); Marrero v. Goya of Puerto

Rico, Inc., 304 F.3d 7, 23-25 (1st Cir. 2002)(the fact that plaintiff was required to do more work

under extreme supervision did not support liability).  Nor is there evidence that Santos' national

origin is different than Polanco's.  See, Benoit, 331 F.3d at 174 (rejecting national origin, color and

racial discrimination claims of plaintiff unable to show that other similarly situated employees

outside of the protected group were treated differently); Zapata-Matos, 277 F.3d at 45, 47-48

(summary judgment dismissing national-origin discrimination claim of plaintiff whose

employment terminated but could not show that employer treated him differently than it treated

other employees).  Therefore, the national-origin discrimination claim must be dismissed.  See,

Zayas-Ortiz v. Becton Dickinson Caribe, Ltd., 968 F.Supp.2d 463, 473 (D.P.R. 2013)(granting

summary judgment where no reasonable factfinder could impute discriminatory animus based on

nationality from instances of alleged discrimination).

## ii.  Hostile Work Environment

Polanco contends she was submitted to a hostile work environment because of her sex

(Docket No. 31).  Hostile work environment is a form of unlawful discrimination prohibited by

Title VII.  Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 106 (1986).  So it exists when the

complained-of conduct is severe or pervasive enough to alter the conditions of plaintiff's

employment and create an abusive work environment.  The conduct must be both objectively and

subjectively offensive, such that a reasonable person would find it abusive, and the plaintiff in fact perceived it to be so.   Additionally, it must be based on plaintiff's statutorily protected characteristics.  Ponte v. Steelcase, Inc., 741 F.3d 310, 319-320 (1st Cir. 2014); Rivera v. Puerto Rico Aqueducts and Sewers Authority, 331 F.3d 183, 188 (1st Cir. 2003).

Hostile work environment claims typically involve repeated conduct.  They are bred from an ongoing series of harassing incidents.  Noviello v. City of Boston, 398 F.3d 76, 84 (1st Cir. 2005).  A single act of harassment may not be actionable on its own.  Johnson, 714 F.3d at 53.  The point at which a work environment becomes abusive does not depend on any "mathematically precise test."  Oncale v. Sundowner Offshore, 523 U.S. 75, 81 (1998).  To determine whether a reasonable person would so find the environment, a court must look at the totality of circumstances, including the severity and frequency of the conduct; whether it was physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interfered with the employee's work performance.  Carmona-Rivera v. Puerto Rico, 464 F.3d 14, 19 (1st Cir. 2006); Ponte, 741 F.3d at 319-320.  None of these factors is individually determinative of the inquiry.  Ayala-Sepúlveda v. Municipality of San Germán, 671 F.3d 24, 31 (1st Cir. 2012).

Polanco claims she was subjected to a hostile work environment created by Rosario.  SUMF-1 at ¶ 109.  She asserts Rosario made negative comments about her morality, such as stating that Polanco's husband maybe was not the father of her child, and insinuating she was "doing something" with Mackey.  OSUMF-1 at ¶ 69.  She maintains Rosario started a rumor that Polanco had slept with the husband of a UW employee and then had the UW employee dismissed.  SUMF-1 at ¶ 118.[62] Rosario sometimes looked at Polanco "from top to bottom," SUMF-1 at ¶ 111, and

---

[62] Polanco, however, had not terminated the UW employee, nor did she have authority to do so.  SUMF-1 at ¶ 119.

commented on several occasions that Polanco's husband was too ugly for such a beautiful woman, referring to Polanco.  SUMF-1 at ¶ 121.

Rosario said Polanco "believes that she's going to buy me with that pretty face and that big ass."  SUMF-1 at ¶ 125.  Polanco reacted by turning to look at him and then walking away.  SUMF-1 at ¶ 125.  While standing in the office in the presence of Polanco, Santos, and Escudero, Rosario commented, "Today is not a day for working. Today is a day for being in bed having sex.  And my wife cannot complain.  My wife cannot complain because I can still have sex with her and I even go down on her."  SUMF-1 at ¶ 122.  Polanco reacted by telling him that was not a topic of conversation at the office, and walked away.  SUMF-1 at ¶ 123.

According to Polanco, Marxuach once told her Rosario had said Polanco was lucky to have her supervisory position, because she was a "pile of shit" and was there only to look after the containers.  SUMF-1 at ¶ 110.  She states her concentration was "broken" because of the hostile work environment Rosario created, which could lead to her taking more time to complete her tasks, or not being able to perform her tasks to the best of her capacity, albeit satisfactorily.

UPS states Polanco cannot pinpoint the date or timeframe in which these incidents occurred (Docket No.120-2 at p. 27).  But it does not question the timeliness of Polanco's claim, and Polanco has provided more than a vague description of the context in which they occurred.  Compare Tuli v. Brigham & Women's Hosp., 656 F.3d 33, 40 (1st Cir. 2011)(sustaining hostile work environment claim based in part on incidents for which plaintiff could not remember specific dates, but provided examples of recurrent behavior), with González v. El Día, Inc., 304 F.3d 63, 69-70 (1st Cir. 2002)(rejecting allegedly ageist remarks in absence of evidence regarding context in which they were made).[63]

---

[63] See also, Hernández-Loring v. Universidad Metropolitana, 233 F.3d 49, 54-56 (1st Cir. 2000)(reversing summary judgment on

UPS argues courts have consistently rejected sexual harassment hostile work environment claims involving facts much more despicable and offensive than those upon which Polanco relies to support her claim (Docket No. 106-1 at p. 17). As the First Circuit has pointed out, the highly fact-specific nature of a hostile environment claim tends to make it difficult to draw meaningful contrasts between one case and another for purposes of distinguishing between sufficiently and insufficiently abusive behavior. See, Billings v. Town of Grafton, 515 F.3d 39, 49 (1st Cir. 2008)(so noting). Conduct that amounts to sexual harassment under one set of circumstances may, in a different context, equate with the sort of "merely offensive" behavior that lies beyond the purview of Title VII and vice versa. Id.

Rosario's behavior was rude, unprofessional, derogatory, and insulting. Any reasonable person in Polanco's position would have felt uncomfortable. A jury may so find, concluding that it went beyond the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing. So viewed, the evidence here is not so deficient that the court may determine, as a matter of law, that Rosario's behavior is insufficient to sustain a hostile work environment claim on account of Polanco's sex. To carry the case forward, however, Polanco must connect the hostile work environment with the employer.

Employer liability depends on whether the objectionable environment is caused by plaintiff's supervisor or by a co-employee. Crowley v. L.L. Bean, Inc., 303 F.3d 387, 401 (1st Cir. 2002); Rosado v. American Airlines, 743 F.Supp.2d 40, 58 (D.P.R. 2010). If caused by a supervisor, the employer is liable unless (1) the employer has exercised reasonable care to prevent and correct any harassing behavior; (2) plaintiff unreasonably failed to take advantage of any

---

hostile environment claim; plaintiff was only specific as to date of two incidents but supplied a precise description of the allegedly offensive remarks).

Case 3:13-cv-01921-MEL   Document 135   Filed 11/10/16   Page 34 of 52

Joanna Polanco, et al. v. UPS Freight Services, Inc., et al.
Civil No. 13-1921 (PAD)
Opinion and Order
Page 34

preventive or corrective opportunities provided by the employer or to otherwise avoid harm; and (3) the harassment has not culminated in a tangible employment action.  Faragher v. City of Boca Ratón, 524 U.S. 775, 807 (1998); Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765 (1998).

When coworkers are responsible for the creation of a hostile work environment, an employer can only be liable if the harassment is causally connected to some negligence on the employer's part.  White v. New Hampshire Dept. of Corrections, 221 F.3d 254, 261 (1st Cir. 2000); Noviello, 398 F.3d at 95.  Typically, this involves a showing that the employer knew or should have known of the harassment and failed to implement prompt and appropriate correction action to stop it.  Noviello, 398 F.3d at 95.  Here, the alleged harassment was caused by Rosario, who was not Polanco's supervisor.  Thus, the parties focus on the sufficiency of UPS's response to Polanco's claim.

Appropriate corrective action is action reasonably calculated to halt the harassment. Álvarez v. Des Moines Bolt Supply, Inc., 626 F.3d 410, 421 (8th Cir. 2010); Andreoli v. Gates, 482 F.3d 641, 644 (3d Cir. 2007); Duncan v. Manager, Dept. of Safety, City and County of Denver, 397 F.3d 1300, 1310 (10th Cir. 2005).  Its reasonableness depends on elements such as whether the employer investigated the complaint; the promptness with which it did so; if a remedial measure was undertaken; and the effectiveness of the measure.  See, Turnbull v. Topeka State Hosp., 255 F.3d 1238, 1244-1245 (10th Cir. 2001)(identifying criteria against which reasonableness may be assessed); Álvarez, 626 F.3d at 421 (same); Andreoli, 482 F.3d at 644 (same).

From these principles, Polanco asserts to have reported all of the events, which occurred "at some point during her employment with UPS," to Shearer either in writing or verbally.  SUMF-1 at ¶ 126.  She claims she complained to HR about Rosario in 2010.  SUMF-1 at ¶ 138.  Rosario was verbally admonished in that instance.  SUMF-1 at ¶¶ 139-140.  But Polanco alleges UPS did

not take appropriate corrective actions to stop Rosario's harassment because, even though he was disciplined, that did not stop him.  She states UPS tolerated his conduct because it was "John [Rosario] being John [Rosario]."

When something was brought to Shearer's attention regarding Rosario, he would bring it up with Rosario's manager.  SUMF-1 at ¶ 127.  Shearer, however, maintains Rosario was difficult to work with (Docket No. 118-2 at ¶ 64).  And Mackey states Rosario "held himself to a different standard that he held others" and had once before being demoted for "not following through on his operational commitments and dealing appropriately with [the] operation's people" (Docket No. 118-2 at ¶ 28).

UPS counters that all incidents brought to Shearer's attention regarding Rosario were in turn referred to Rosario's manager; investigated and resolved; and that Shearer never heard Rosario make any sexual innuendo, nor was he ever informed by anyone, including Polanco, of Rosario's making any such comments (Docket No. 118-2 at ¶ 64).  It asserts some of these investigations concluded in actions taken against Rosario, such as when he was demoted for "not following through on his operational commitments and dealing appropriately with [the] operation's people."  It argues that in a number of instances Polanco told Rosario to stop and he in fact stopped while on others Polanco just walked away from the conversation.  Finally, it acknowledges Rosario was "difficult to work with" and "held himself to a different standard that he held others," conceding Rosario "could be a stir to anyone of us" and "[i]t didn't matter if you were a male or female, or whatever, he'd, he's stir the pot, sort of speak" (Docket No. 118-2 at ¶ 64).

On this record, a jury could reasonably conclude that UPS did not adopt measures reasonably calculated to put an end to Rosario's objectionable behavior towards Polanco.  It could find that for UPS, the marginal cost of additional measures exceeded the marginal benefit the

measures were intended to promote, and therefore, were not justified in light of the factual background against which they were evaluated and anticipated to be implemented.  But it could reach the opposite conclusion, depending on how it weighs the evidence.  In these circumstances, UPS' request for summary judgment as to Polanco's hostile work environment claim must be denied.  See, Zayas-Núñez v. Selectos Campo Rico, Inc., 2016 WL 1047360, * 9 (D.P.R. March 16, 2016)(denying summary judgment; for "what constitutes a 'prompt and appropriate' employer response to allegations of sexual harassment often requires the sort of case-specific, fact-intense analysis best left to a jury").[64]

### iii.  Retaliation

Polanco contends UPS retaliated against her in violation of Title VII (Docket No. 31).  Title VII forbids a covered employer from retaliating against an employee because she "has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e–3(a); Univ. of Tex. v. Nassar, ---U.S.---, 133 S. Ct. 2517, 2523 (2013).

Polanco did not come up with direct evidence of retaliation.  Absent such evidence, a plaintiff must establish a *prima facie* case of retaliation by showing that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal nexus exists between the protected conduct and the adverse action.  Collazo-Rosado v. University of Puerto Rico, 765 F.3d 86, 92 (1st Cir. 2014); Garayalde-Rijos v. Municipality of Carolina, 747 F.3d 15,

---

[64] In context, "[a] reasonable jury may find that an employer response was not prompt and appropriate without being so indifferent as to indicate an attitude of permissiveness amounting to discrimination."  See, Forrest v. Brinker Intern. Payroll Co., LP, 511 F.3d 225, 231 and n.8 (1st Cir. 2007)(so stating).  Nevertheless, an employer need not prove success in preventing harassing behavior in order to demonstrate that it exercised reasonable care in preventing and correcting harassing conduct.  Ortiz v. Procter & Gamble, 2006 WL 2463963, *11 (D.P.R. 2006).  Different aspects of this issue are examined in EEOC v. Xerxes Corp., 639 F.3d 658, 669-670 (4th Cir 2011).

24 (1st Cir. 2014).   Once the plaintiff makes out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory explanation for its action.   Planadeball v. Wyndham Vacation Resorts, Inc., 793 F.3d 169, 175 (1st Cir. 2015)(citing, Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 46 (1st Cir. 2010)).   If the defendant does so, the burden shifts back to the plaintiff to show that the defendant's explanation is a pretext for unlawful retaliation.   Id.

Polanco claims she was terminated from her employment in retaliation for complaining about Rosario and raising concerns related to Escudero in August 2012.   SUMF-1 at ¶ 132.   She asserts that on or around August 27, 2012, she informed Shearer Rosario had falsely claimed he had observed Escudero being "dry humped" by a driver named Juan Rodríguez in the office area.   SUMF-1 at ¶ 133.   After the investigation as to the Escudero issues concluded, she was asked by Mackey why she had gone directly to UW to address her concern.   SUMF-1 at ¶ 135.   Polanco answered she did so because those were the instructions she had from Mackey and Shearer.   SUMF-1 at ¶ 135.   Both Mackey and Shearer then informed her that in the future, she should address any issue directly to UPS.   SUMF-1 at ¶ 136.

By complaining of sex discrimination and harassment from Rosario, Polanco engaged in protected activity.   And her dismissal constitutes an adverse employment action.   See, Murray v. Kindred Nursing Centers West LLC, 789 F.3d 20, 25 (1st Cir. 2015) (finding that plaintiff experienced an adverse employment action when she lost her job).   UPS concedes as much, leading the parties to argue over whether Polanco has shown a causal nexus between her protected conduct and the discharge.

Causality may be established by temporal proximity if the protected activity and the material adverse action is very close.   See, Clark County School Dist., v. Breeden, 532 U.S. 268,

273-274 (2001).  The First Circuit has held that a period of approximately three months between the protected activity and the adverse action is close enough "to meet the relatively light burden of establishing a *prima facie* case of retaliation."  See, Sánchez-Rodríguez v. AT&T Mobility P.R., Inc., 673 F.3d 1, 15 (1st Cir. 2012) (holding plaintiff established a *prima facie* case of retaliation where three months and nine days had transpired between the protected conduct and the material adverse action).[65]

In this instance, three months and sixteen days elapsed between Polanco's protected activity on August 27, 2012, and her discharge on December 8, 2012.  Temporal proximity is close enough to establish causality.  Because Polanco has made a *prima facie* case of retaliation, the burden shifts to UPS to show that it had a non-retaliatory reason for Polanco's termination.  UPS has met its burden, relying on Polanco's violation of company policies by altering package volumes and cube utilizations, which resulted in the overcharging of customers.  But as discussed earlier, summary judgment is inappropriate.

Where the evidence can reasonably be viewed as demonstrating either discriminatory animus or retaliatory animus, courts may consider the same evidence in assessing the sufficiency of both of the plaintiff's claims.  See, Pérez-Cordero v. Wal-Mart, 656 F.3d 19, 32 (1st Cir. 2011)(so noting).  And along the same line, Santos did not engage in protected activity but was not discharged, notwithstanding the –disputed- fact that like Polanco, he and other employees made volume adjustments after Polanco's termination.  See, Che v. Massachusetts Bay Transp. Authority, 342 F.3d 31, 39 (1st Cir. 2003)(acknowledging that one way of showing pretext for retaliation is presenting evidence of disparate treatment).  Hence, UPS's request for summary

---

[65] In Sánchez-Rodríguez, three months and nine days transpired between plaintiff's protected activity (his filing of an EEOC charge) on February 8, 2007, and the material adverse action (being disciplined for absenteeism) on May 17, 2007.  See Appellants' Brief in First Circuit Case No. 10-2177, 2011 WL 680603, *12 and 33.

judgment as to the Title VII retaliation claim must be denied.

### 2. Puerto Rico Law

Polanco complains of: (1) discrimination because of sex and national origin; (2) hostile

work environment; (3) retaliation; and (4) unjust discharge under Law Nos. 100, 69, 17, 115, and

80 (Docket No. 31). Law 100, Puerto Rico's general employment discrimination statute, prohibits

discrimination in employment by reason of sex and national origin, among other protected

grounds. P.R. Laws Ann. tit. 29 § 146. Law 69 forbids discrimination in employment on the basis

of sex, and makes it unlawful for an employer to dismiss or discriminate against any employee

who (1) files a complaint or charge; (2) is opposed to discriminatory practices; or (3) participates

in an investigation or suit for discriminatory practices against the employer. P.R. Laws Ann. tit.

29 § 1323.

In turn, Law No. 17 outlaws sexual harassment and protects the employee against

retaliatory action by the employer due to an employee's participation in the lodging or

investigation of a sexual harassment complaint. P.R. Laws Ann. tit. 29 § 155–155l. As of the date

of the events here, Law 115 protected employees that offered testimony before an administrative,

judicial, or legislative forum from adverse actions by their employers. P.R. Laws Ann. tit. 29 §

194a. Law No. 80 provides for compensation under certain conditions, in case of a discharge

without just cause. P.R. Laws Ann. tit. 29 § 185a.

### i. Discrimination

As pointed out above, Polanco lacks direct evidence of discrimination. But she may prove

discrimination through a burden-shifting method centered on just cause. To that end, a plaintiff

establishes a *prima facie* case of discrimination under Law No. 100 by demonstrating that: (1) she

suffered an adverse employment action; (2) the adverse action lacked just cause; and (3) there

exists some basic fact substantiating the type of discrimination alleged to have occurred. See, Rodríguez v. Executive Airlines, ---F.Supp.3d----, 2016 WL 4640362, *3 (D.P.R. March 31, 2016)(setting forth elements of *prima facie* case).[66]   The *prima facie* case creates a rebuttable presumption of discrimination. See, Menzel v. Western Auto Supply Co., 848 F.2d 327, 331 (1st Cir. 1988)(so holding).[67]

Once the presumption in activated, it shifts to the employer the burden of showing by a preponderance of the evidence that the challenged action was not discriminatory. See, De Arteaga v. Pall Ultrafine Filtration Corp., 862 F.2d 940, 941 (1st Cir. 1988)(describing effect of presumption); Varela-Teron, 257 F.Supp.2d at 464 (same)(citing Ibañez-Benitez v. Molinos de P.R. Inc., 114 D.P.R. 42, 53 (1983)).  Should the employer do so, the presumption disappears.  At that point, "the burden of persuasion shifts back to the employee to demonstrate that the … [action] was motivated by discrimination." See, Hoyos v. Telecorp Communications, Inc., 488 F.3d 1, 6 (1st Cir. 2007)(so stating); Hernández, 151 D.P.R. 754, 775 & n.9 (noting that once presumption disappears, employee may prevail with evidence showing existence of discrimination).

With this backdrop, subsequent to Álvarez-Fonseca a number of First Circuit opinions reflect a modified framework of plaintiff's initial burden under Law No. 100.  As described in Cardona-Jiménez, 174 F.3d at 42, the employee's initial burden is to: (1) demonstrate that she was actually or constructively discharged; and (2) allege that the decision was discriminatory (citing Álvarez-Fonseca, 152 F.3d at 28).[68]  But while the Court in Cardona-Jiménez referred to Law No.

---

[66] See also, Varela-Teron v. Banco Santander de Puerto Rico, 257 F.Supp.2d 454, 463, 466 (D.P.R. 2003)(discussing elements of *prima facie* case)(citing Díaz-Fontanez v. Wyndham Hotel, 155 D.P.R. 361 (2001)); Hernández v. Trans Oceanic Life Ins. Co., 151 D.P.R. 754, 775 (2000); and Belk Arce v. Martínez, 146 D.P.R. 215, 230-31 (1998).

[67] See also, Álvarez-Fonseca v. Pepsi Cola of Puerto Rico Bottling Co., 152 F.3d 17, 28 (1st Cir. 1998)(explaining that presumption of discrimination is triggered under Law No. 100 upon a showing that employer lacked just cause for the discharge or other adverse action taken against the employee).

[68] See also, Hoyos, 488 F.3d at 6 (stating that employee alleging violation of Law 100 has the initial burden to establish *prima facie*

100, it cited the portion of Álvarez-Fonseca referring to Law No. 80.  See, Álvarez-Fonseca, 152

F.3d at 28.  A sister court in this District so noted, pointing out that the citation refers to a *prima*

*facie* case under Law No. 80, not Law No. 100.  See, Varela-Teron, 257 F.Supp.2d at 464 (so

noting).[69]

Not all post-Álvarez-Fonseca First Circuit cases, however, have adopted the Cardona

reading of Álvarez-Fonseca.  In Ramos v. Davis & Geck, Inc., 167 F.3d 727 (1st Cir. 1999), the

First Circuit stated that under Law No. 100, "once the employee triggers the act's protections by

showing that his discharge, constructive or otherwise, was not justified, the employee enjoys a

presumption that he or she has been the victim of discrimination and the burdens of both production

and persuasion shift to the employer."  Id. at 734 (citing Álvarez-Fonseca, 152 F.3d at 27).[70]  See

also, Rodríguez-Torres v. Caribbean Forms Manufacturer, Inc., 399 F.3d 52, 62 (1st Cir.

2005)(validating jury instruction to the effect that for burden of proof in a Law No. 100 claim to

shift to employer, plaintiff had to prove that: she was in a protected class, was fired, and the

termination was unjustified); Menzel, 848 F.2d at 331 (holding that "[i]f plaintiff fails to show that

there was no just cause, the presumption of discrimination is not activated").[71]

---

case of discrimination by (1) demonstrating that he was actually or constructively discharged, and (2) alleging that the decision was discriminatory).

[69] An employee's initial burden under Law No. 80 is to allege unjustified dismissal and prove actual dismissal.  Álvarez-Fonseca, 152 F.3d at 28.  The burden of proof shifts to the employer, who must establish, by a preponderance of the evidence, that the discharge was justified.  Id.

[70] All in all, this reading seems more consistent with the Supreme Court of Puerto Rico's description of plaintiff's initial burden under Law No. 100 as formulated in Díaz-Fontanez, 155 D.P.R. at 389 (noting the statutory presumption facilitates plaintiff's evidentiary burden if plaintiff establishes the basic elements triggering the presumption, in other words, that she was discharged without just cause and the discharge falls within the scope of the type of discrimination claimed), and in Hernández, 151 D.P.R. at 754, 775 (2000)(holding that employee shall begin presenting evidence showing a discharge or adverse action; absence of just cause; and some basic fact placing it within the modality of discrimination claimed).  See, Varela-Teron, 257 F.Supp.2d at 464 (recognizing consistency between the Ramos reading of Álvarez-Fonseca and the Puerto Rico Supreme Court's description of a plaintiff's initial burden under Law No. 100).

[71] To the same effect, see, Salgado-Candelario v. Ericsson Caribbean, Inc., 614 F.Supp.2d 151, 176 (D.P.R. 2008)(holding that "[u]nder Law 100, plaintiff bears the initial burden of establishing: (1) that she suffered an adverse employment action; (2) that the adverse employment action was not justified; and 93) some basic fact substantiating the type of discrimination alleged"); Santiago-Rivera v. Johnson & Johnson, 436 F.Supp.2d 316, 325 (D.P.R. 2006)(noting that under Law No. 100 the employee has initial

Moving from the general to the particular, Polanco may be said to satisfy both of the stated formulations of Law No. 100.  As noted above in connection with Title VII, UPS conceded Polanco made out a *prima facie* case.  Policy violations such as the one here constitute legitimate grounds for termination, and as such, qualify as just cause for termination under Law No. 80.  However, the circumstances under which those violations were applied to terminate Polanco's employment permits the presumption to be activated.

As discussed below in connection with Law No. 80, just cause normally requires similarity of treatment for similarly situated individuals, something as to which a genuine factual issue has been raised in this case.  And if the discharge were found to have been discriminatory or retaliatory, it would not be predicated on just cause.  See, Díaz, 155 D.P.R. at 387.  So at the end of the day, a reasonable jury may conclude that Polanco was discriminated against under Law No. 100 because of her sex, albeit not –as already explained in connection with Title VII- with respect to national origin.

### ii.  Hostile Work Environment

Law 17, Law 69, and Law 100 work in concert to proscribe sexual harassment in the form of hostile work environment.  See, Godoy v. Maplehurst Bakeries, Inc., 747 F.Supp.2d 298, 317 (D.P.R. 2010) (citing, Figueroa García v. Lilly del Caribe, Inc., 490 F.Supp.2d 193, 212 (D.P.R. 2007)).  Hostile work environment claims brought under these statutes and Title VII are essentially the same.[72] Considering that summary judgment must be denied as to the hostile work environment

---

evidentiary burden to establish: "(1) that he or she suffered an adverse employment action, (2) that the adverse employment action was unjustified (not for good cause), and (3) some basic fact substantiating the type of discrimination alleged").

[72] See, Gerald v. University of Puerto Rico, 707 F.3d 7, 28 (1st Cir. 2013) (pointing out that denial of summary judgment on plaintiff's Title VII harassment claim warranted denial of claims under Law 17 and 69 because "the substantive law of Puerto Rico on sexual harassment appears to be aligned with Title VII law; the latter's precedents being used freely to construe the former"); Godoy, 747 F.Supp.2d at 317 (same).

Joanna Polanco, et al. v. UPS Freight Services, Inc., et al.
Civil No. 13-1921 (PAD)
Opinion and Order
Page 43

claim under Title VII, UPS's summary judgment motion must therefore be denied as to Polanco's

hostile work environment claims under Law 17, Law 69, and Law 100.

### iii.  Retaliation

The record lacks direct evidence of retaliation.  Courts, however, have treated similarly,

retaliation claims under Title VII, Law No. 17, Law No. 69 and Law No. 115. Thus, a plaintiff may

utilize the Title VII burden-shifting framework to establish a case of retaliation under Puerto Rico

law.[73]  Because summary judgment is inappropriate as to the Title VII retaliation claim, UPS's

summary judgment motion must be denied with respect to Polanco's retaliation action under Law

Nos. 17 and 69.   See, Levine-Díaz v. Humana Health Care, 990 F.Supp.2d 133, 157 (D.P.R.

2014)(denying summary judgment as to retaliation claims under Law Nos. 17 and 69, given that

record showed genuine issue of fact as to the Title VII retaliation claim)  Nonetheless, it must be

granted as to Law No. 115.[74]

---

[73] See, Rodríguez v. Wyndham, 2014 WL 651972, *11-13 (D.P.R. Feb. 19, 2014) (entering summary judgment under Law No. 17, inasmuch as having applied burden-shifting framework under Title VII there was no genuine issue as to whether plaintiff was retaliated against); Santiago-Rivera, 436 F.Supp.2d at 324-326 (same with respect to retaliation claim brought under Law No. 69); Godoy, 747 F.Supp.2d at 318 (noting that since evidentiary mechanism provided by Law No.115 mirrors the McDonnell Douglas', courts have treated Law No. 115 and Title VII retaliation claims the same); Feliciano v. Sheraton Hotel, 182 D.P.R. 368, .395-399 (2011)(acknowledging correspondence ["congruencias"] between Title VII and Law No. 115 while analyzing local retaliation claim in light of burden-shifting method utilized in connection with Title VII).

[74] UPS asked for dismissal of Polanco's supplemental claims under, among other statutes, Law Nos. 17 and 115 (Docket No. 106-1 at p. 23).  At the outset, Law No. 115 does not apply to the facts of this case.  Polanco's employment terminated in December 2012.  At that time, protected activity under Law No. 115 was limited to activity linked to administrative, legislative and judicial fora.  It did not include internal complaints to protest or oppose statutorily prohibited discrimination.  See, Collazo v. Bristol-Myers, 617 F.3d 39, 45 (D.P.R. 2010(concluding that plaintiff's internal request for technical documents in preparation for upcoming FDA preapproval inspection did not amount to offering or attempting to offer information to a government authority within the meaning of Law No. 115).  In 2014, the statute was amended to include as protected activity, the provision of information or the attempt to provide information to a company employee or representative in a position of authority or in internal company procedures.  See, Law No. 169 of September 29, 2014 (amending Law 115 to expand scope of activity protected by the statute).  At the same time, the amendment is prospective.  Id.  So it does not cover the facts here.  Plaintiff, however, invoked the protection of not only Law No. 115, but also of Law Nos. 17 and 69 (Docket No. 31 at p. 4).  And Law Nos. 17 and 69 apply to situations such as Polanco has raised, covered by Title VII albeit not covered by Law No.115 prior to September 2014.  Therefore, even though Law No. 115 does not apply, the supplemental retaliation claim remains under Law No. 17 and Law No. 69.  See, Bristol-Myers, 617 F.3d at 54 (affirming summary judgment respecting Law No. 115 while vacating judgment insofar as it granted summary judgment on plaintiff's retaliation claims under Title VII, Law No. 17 and Law No. 69).  Even if Polanco were to prevail on the retaliation claim, however, the fact that she has complained of retaliation under different statutes would not mean entitlement to separate recovery under each of those statutes.  See, Linn v. Andover Newton, 874 F.2d 1, 8 (1st Cir. 1989)(observing that plaintiff may not recover twice for the same injury regardless of how many legal grounds support the award), citing Freeman v. Package Machinery Co., 865 F.2d 1331, 1345 (1st Cir. 1988)(noting that "plaintiff, although entitled to the same damages under both federal and state statutes, could collect them but once").  Likewise, a compensatory award is separate from a punitive doubling of damages provided for by

####    iv.   Unjust Discharge

Law No. 80 makes certain employers liable for an indemnity to employees hired for undefined term who are discharged without just cause.  P.R. Laws Ann. tit. 29 § 185a.[75]  The statute (1) contains a general definition of just cause; (2) provides guidance on the application of this concept to various scenarios related to employee misconduct and performance, as well as to reductions-in-force and shutdowns; and (3) imposes on the employer the burden to plead and establish just cause.  See, P.R. Laws Ann. tit. 29 §§ 185b, 185k.

In general, just cause for dismissal excludes the mere whim or fancy of the employer.  Id. at § 185b.  But it encompasses grounds related to the proper and normal operation of the enterprise or establishment.  Rosado, 743 F.Supp.2d at 55.  Policy violations such as the one UPS has asserted qualify as just cause for discharge.  A discriminatory or retaliatory termination, however, is not considered justified.  Díaz, 155 D.P.R. at 387.  Just cause does not normally exist when similarly situated individuals have been treated differently.  See, Ruy Delgado Zayas, Apuntes para el Estudio de la legislación protectora del trabajo en el Derecho Laboral Puertorriqueño, pp. 152-153 (2007)(discussing consistency as element of just cause under Law No. 80).

In this case, there is a genuine issue of fact on whether Polanco and her successor have been treated differently.  In consequence, summary judgment must be denied as to the Law 80 claim on the same basis that it was denied as to Polanco's discrimination and retaliation claims.

---

Law Nos. 17 and 69.  Thus, under such a scenario Polanco would not be entitled to doubling of damages under Law No. 17 in addition to doubling of damages under Law No. 69.

[75] The indemnity consists of: (A) two (2) months' pay plus one (1) week's pay for each completed year of service in case of employees with up to five (5) years of service; (B) three (3) months' pay plus two (2) weeks of pay for each completed year of service in case of employees with more than five (5) but less than fifteen (15) years of service; and (C) six (6) months' pay plus three (3) weeks' pay for each completed year of service in case of employees with fifteen (15) or more years of service,  P.R. Laws Ann. tit. 29 § 185(a).  See, Soto-Lebrón v. Federal Express Corp., 538 F.3d 45, 55 (1st Cir. 2008)(describing Law No. 80 compensation formula).  As explained in Jorge L. Capó-Matos, *Employment at Will: A State-by-State Survey, Puerto Rico*, 932-936, the indemnity is colloquially referred to as the "mesada," a Spanish language term that denotes a monthly payment, which has its distant origin in Article 302 of the Spanish Commerce Code of 1886, which continued in effect after Spain ceded its sovereignty over Puerto Rico as part of the peace treaty to end the Spanish American War.

See, Collazo, 617 F.3d at 53 & n.10 (reversing grant of summary judgment on Law No. 80 claim in light of conclusion that there was a genuine issue of fact as to whether plaintiff's termination was the result of retaliatory animus, rather than company reorganization and inadequate performance).

### B. Nevárez

Relatives of victims of employment discrimination have a cause of action under the Puerto Rico general tort statute, Article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 §§ 5141. Maldonado v. Cooperativa de Ahorro, 685 F.Supp.2d 264, 279 (D.P.R. 2010). Such claims are "contingent upon" the employee's underlying discrimination claim. Marcano-Rivera v. Pueblo Intern., Inc., 232 F.3d 245, 258 n.7 (1st Cir. 2000). Given that Polanco's discrimination claims are still alive, so is her spouse's claim under the Civil Code.

### C. Escudero

Escudero alleges that UPS (1) discriminated against her because of her sex; (2) subjected her to a hostile work environment because of her sex; and (3) retaliated against her for complaining of such conduct (Docket No. 107-1 at p. 1). And thus, she claims entitlement to relief under Title VII (Docket No.31 at ¶¶ 32, 33, 37, 47, 48). UPS alleges it was never Escudero's employer (Docket No. 107). Escudero admitted as much, and that "they have no employee-employer contractual relationship" (Docket No. 113 at p. 10). On that basis, her claims against UPS under Title VII must be dismissed. See, Camacho v. Puerto Rico Ports of Authority, 369 F.3d 570, 573 (1st Cir. 2004)(holding that Title VII liability attaches only in the event of a covered employment relationship).[76] In an abundance of caution, however, the court will analyze the parties' relationship on the merits.

---

[76] It is unclear whether Escudero is also asserting a claim of race and/or national origin discrimination under Title VII against UPS.

Title VII's definition of "employee" does not cover independent contractors, and therefore independent contractor may not maintain a Title VII action against the entity with which she contracts. Alberty-Vélez v. Corporación de Puerto Rico Para La Difusión Pública, 361 F.3d 1, 6 (1st Cir. 2004). The First Circuit has applied the "common law agency test" to determine whether a plaintiff is an employee or an independent contractor under Title VII. Id. Under such test, a court must consider:

> the hiring party's right to control the manner and means by which the product is accomplished. Among other factors relevant to this inquiry are the skills required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

Id. at 7. No one factor is decisive and, in most situations, the extent to which the hiring party controls "the manner and means" by which the worker completes her tasks will be the most important factor in the analysis. Id. (citing, Eisenberg v. Advance Relocation & Storage, Inc., 237 F.3d 111, 114 (2nd Cir. 2000)). From those factors, it must be said that Escudero is not an employee of UPS.

As stated above, UW provides warehousing and office services and space for UPS in Puerto Rico. It coordinates the delivery of packages belonging to UPS customers through independent truck drivers and loading packages belonging to UPS customers into containers with are destined

---

The Amended Complaint makes a vague reference to "discrimination on the basis of [Escudero's] sex, female, and national origin, Puerto Rican" (Docket No. 31 at ¶ 132), but nowhere else are these claims asserted again. Moreover, Escudero's response to UPS's motion for summary judgment does not include any facts relevant to a claim for race or national origin (Docket No. 113). At any rate, considering the absence of an employee-employer relationship between Escudero and UPS, any such claims would suffer the same fate.

to the US mainland.  To that end, it mixes these shipments with those of other UW customers in a way that is most efficient for UW.

UPS has minimal control over the strategies and methods used by UW to perform its responsibilities under the agreement between UW and UPS, and its focus is on having the customer's cargo delivered in a timely manner.  UW has similar relationships with other logistic companies.  UW and UPS have agreed that certain functions of UPS's operation will be executed by employees of UW, but UPS does not determine the individuals assigned to those responsibilities.  Rather, UW determines how to staff the operation.

UW employees do not report directly to UPS, but to their organization.  Bernardi, UW's General Manager, is the only person authorized to change the work schedule and make decisions regarding those UW employees that work on the UPS account.  Escudero was assigned by UW to work the UPS account at UPS's distribution center in Amelia Ward, Guaynabo.  She was interviewed, hired, and oriented about policies by Bernardi, and is required to follow instructions given by him.  In addition, UW was the entity that decided Escudero's salary and reviewed her performance.  UPS does not compensate her in any way (or even know what her compensation is) or provide her with benefits of any kind.  Nor does UPS maintain employment records of Escudero or have insurance policies covering her or other UW employees.

UPS employees do not have the authority to discipline or terminate UW employees, including Escudero, and, for matters involving a larger problem, UPS would have to communicate with UM management who would then speak directly to the UW employee.  Similarly, UPS lacks legal authority to alter her terms and conditions of employment of Escudero or other UW employee.  On these facts, Escudero is not an employee of UPS.

Escudero alleges UPS may be liable under the "single employer" doctrine (Docket No. 31 at ¶ 116). However, she did not discuss this issue in her opposition to summary judgment. The First Circuit has cautioned that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. So Escudero's single employer argument is waived.[77] And even if she had not waived her argument, it would fail. The single employer doctrine is used to determine if "separate corporations are not what they appear to be, that in truth they are but divisions or departments of a single enterprise." Ashe v. Distribuidora Norma, Inc., 7 F.Supp.3d 134, 145 (D.P.R. 2014) (citing, Torres-Negrón v. Merck & Company, Inc., 488 F.3d 34, 43 (1st Cir. 2007); NLRB v. Deena Artware, Inc., 361 U.S. 398, 402 (1960)).

The First Circuit has recognized three different tests that have been used to determine whether multiple corporate entities acted as one: (a) the integrated-enterprise test, (b) the corporate law "sham" test, and (c) the agency test. Id. at 145-146 (citing, Romano v. U-Haul Int'l, 233 F.3d 655, 665 (1st Cir. 2000)).[78] Under the integrated-enterprise test, the court considers the following four factors: (1) common ownership; (2) common management; (3) interrelation between operations; and (4) centralized control over labor relations. Id. at 146 (citing, Romano, 233 F.3d at 662).

---

[77] See, Snyder v. Collura, 812 F.3d 46 (1st Cir. 2016) (deeming waived a claim asserted in the complaint that was not discussed by plaintiff in his opposition to a motion for summary judgment; "its cameo role in the complaint" was not enough to survive summary judgment); Steeves v. City of Rockland, 600 F.Supp.2d 143, 175 (D. Me. 2009) (holding that plaintiff had waived any claims against defendants in their individual capacities even though the complaint stated they were being sued in their individual capacities, where, in opposition to motion for summary judgment, she did not take issue with defendants' construction of the complaint as naming them only in their official capacities (citing, Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 678 (1st Cir. 1995)).

[78] Although the First Circuit has not specified which of the three tests is proper for a single employer doctrine, "the integrated-enterprise test currently appears to be the standard adopted, or at least applied, by a majority of circuits that have reached the issue." Romano, 233 F.3d at 665 (citing several circuit cases). The agency test and the sham test are not applicable under the facts of this case, for they require a parent-subsidiary relationship, which the parties have not alleged or established here. See, Ashe, 7 F.Supp.3d at 146 (noting that "the corporate law 'sham' test is used to determine whether a parent-subsidiary relationship is actually fake," and "the agency test constitutes a method to evaluate the parent-subsidiary company relationship" in order to hold the parent company liable for the actions of its subsidiary company when its "control over its subsidiary is such that it practically makes the subsidiary an agent of the parent company" (citing, Mas Marques v. Digital Equipment Corp., 637 F.2d 24, 27 (1st Cir. 1980)).

The uncontested facts show UPS and UW do not share common ownership or management. They have separate boards of directors, shareholders and proprietors.  Rodríguez, UW's President and sole owner, is not an employee of UPS, and does not have any other relationship with UPS other than the one established in the agreement between UPS and UW.  He is not a member of the board of directors of UPS or any of its related entities, and lacks decisional power within the UPS organization.  In addition, UPS and its affiliated companies do not have any proprietary interest in UW.

As to the operations of the two companies, UW has service agreements with other companies besides UPS, and can refuse to offer services to UPS in the future by deciding to terminate the contract with UPS, which it can unilaterally do, with a sixty-day notice.  Similarly, the companies do not have centralized control over labor relations.  They each personnel independently.  UPS does not have the authority to discipline or terminate UW employees, as each company makes its hiring decisions separately and decide which employee to assign to each task. Bernardi is the only person authorized to make personnel decisions involving UW employees, and to change their work schedule.   In the same way, Escudero herself admitted that when she complained of Rosario's conduct, she contacted Bernardi and Rodríguez because they were her employers and she thought they could protect her.  It is apparent that UW and UPS are not a single employer.[79]

---

[79] It is unclear whether Escudero properly plead that UPS and UW are "joint employers" (Docket No. 31 at ¶ 116).  Even if her Second Amended Complain were to be so construed, the assertion must be considered waived for the same reason her "single employer" argument is waived.  See, Snyder, 812 F.3d 46; Steeves, 600 F.Supp.2d at 175; Grenier, 70 F.3d at 678.  In addition, assuming the argument has not been waived, it would fail.  Two parties can be considered joint employers and therefore be liable under Title VII if they share or co-determine those matters governing the essential terms and conditions of plaintiff's employment. Casey v. Dep't of Health & Human Servs., 807 F.3d 395, 404 (1st Cir. 2015); Rivas v. Federación de Asociaciones Pecuarias de Puerto Rico, 929 F.2d 814, 820 (1st Cir. 1991).  Various elements are relevant to such inquiry, to wit: which company (1) hired the employee; (2) pays the employee; (3) assigns work; (4) makes personnel decisions; (5) disciplines the employees; and (6) supervises the employees.  Rivas, 929 F.2d at 816.  As has been discussed, the undisputed facts show that UW, not UPS, determined Escudero's terms and conditions of employment.  The agreement between UW and UPS stipulates that certain functions of the operation will be executed by employees of UW.  UW has its own workforce and may choose to staff the operation any way it pleases.  UPS does not determine which individuals will be assigned which responsibilities.  UW employees report to their organization, specifically

Joanna Polanco, et al. v. UPS Freight Services, Inc., et al.
Civil No. 13-1921 (PAD)
Opinion and Order
Page 50

Given that UPS is not Escudero's employer, her Title VII claims against UPS for discrimination, hostile work environment and retaliation must be dismissed. Nevertheless, the pleadings also refer to 42 U.S.C. § 1981 (Docket No. 31 at ¶ 15), which gives all persons equal rights to "make and enforce" contracts free from racial discrimination. Id.[80] Contrary to Title VII, Section 1981 is not limited to employees. Danco v. Wal-Mart, 178 F.3d 8, 13-14 (1st Cir. 1999). But for an employee of a contractor to be so covered, the employee must be contractually linked to the defendant. Id.

There is no allegation that Escudero had a contract with UPS. None of the pleadings (Complaint, Docket No. 1; Amended Complaint, Docket No. 5; Second Amended Complaint, Docket No. 31) so allege. Nor do those pleadings contain minimum factual predicates to anchor a colorable national-origin discrimination claim on.[81] Even though UPS challenged the claim pursuant to Fed.R.Civ.P. 56, Escudero made no attempt to develop the claim in the summary judgment record.[82] To the extent the claim has not been waived because of its perfunctory treatment,[83] it lacks merit. In either case, it must be dismissed. See, Colón v. Infotech, 2011 WL

---

to Bernardi, and Carmona, both of whom are managerial employees of UW. Bernardi is the only person authorized to change the work schedule and make personnel management decisions related to UW employees that work on the UPS account. UPS does not hire, evaluate, discipline or terminate, prepare work schedules, or make recommendations on salaries, bonuses or compensation for UW employees. Nor does it maintain employment records of Escudero or have insurance policies covering her or other UW employees. And thus, UPS and UW cannot be considered joint employers of Escudero.

[80] See, PowerComm, LLC v. Holyoke Gas & Elec. Dept., 657 F.3d 31, 36-37 (1st Cir. 2011)(discussing claim based on disparaging comments made by defendant's officials or employees about Puerto Ricans under 42 U.S.C. § 1981).

[81] See, footnote 76.

[82] UPS moved under Title VII rather than Section 1981. Yet Section 1981 borrows Title VII's case law. See, Danco, 178 F.3d at 13 (recognizing symmetry of Title VII and Section 1981actions). The same legal framework applies to both statutory bases. Bhatti v. Trustees of Boston University, 659 F.3d 64, 70 (1st Cir. 2011); Conward v. Cambridge School Committee, 171 F.3d 12, 18-19 (1st Cir. 1999).

[83] See, Malave-Torres v. Cusido, 919 F.Supp.2d 198, 213 (D.P.R. 2013)(dismissing hostile environment claim briefly mentioned in the complaint and not addressed in opposition to defendant's motion for summary judgment); Martínez-Cintrón v. United States, 2005 WL 196 1642, *1 (D.P.R. Aug. 16, 2005)(generic and perfunctory claims deemed waived); Nieves-Domenech v. Dymax Corp., 952 F.Supp. 57, 65 (D.P.R. 1996)(conclusory reference to Article 1802 insufficient to preclude waiver). See also, Rocafort v. IBM Corp., 334 F.3d 115, 122 (1st Cir. 2003)(passing reference to legal phrases and case citation without developed argument is not sufficient to defeat waiver").

8194853, *5 (D.P.R. Dec.21, 2011)(dismissing, among other claims, claim of race and national origin discrimination where plaintiff provided no factual basis in support of claim); Morales-Santiago v. Aramark Cleanroom Services (Puerto Rico), Inc., 2011 WL 4899959, *6 (D.P.R. Oct. 14, 2011)(dismissing national origin discrimination action for lack of supporting factual argumentation); Benoit, 331 F.3d at 174 (rejecting national origin, color and racial discrimination claims of plaintiff unable to show that other similarly situated employees outside of the protected group were treated differently).

## V.    CONCLUSION

Careful review of the record in its entirety leads the court to deny UPS's "Motion for Summary Judgment" as to Polanco and Narváez (Docket No. 106) except for Polanco's national-origin discrimination claim under Federal and Puerto Rico law and the Law No. 115 retaliation claim. The "Motion for Summary Judgment" regarding Escudero (Docket No. 107) is granted in part.[84] In this way, Escudero's claims are dismissed, but the dismissal of the supplemental state claims is without prejudice. See, Camelio v. American Federation, 137 F.3d 666, 672 (1st Cir. 1998) (Federal courts may decline to exercise supplemental jurisdiction over a plaintiff's state law claims when the federal claims that gave it original jurisdiction are dismissed); Díaz-Figueroa v. RICOH, 661 F.Supp.2d 140, 155 (D.P.R. 2009)(dismissing Puerto Rico law claims without prejudice after dismissing the federal claims on the merits).[85]

---

[84] The Motion for Summary Judgment requests dismissal of Escudero's claims with prejudice (Docket No. 107 at p.3).

[85] Escudero does not dispute UPS's jurisdictional analysis in support of dismissal of the supplementary state claims, based in part on lack of complete diversity between the parties (Docket No. 120 at p. 9 n.2). In the Civil Cover Sheet, plaintiffs identified Federal Question Jurisdiction as the basis for jurisdiction (Docket No. 3-1 at p. 1), and the Second Amended Complaint invokes 28 U.S.C. § 1367 (supplemental jurisdiction) as the jurisdictional basis for state law claims (Docket No. 31 at ¶ 15).

<u>Joanna Polanco, et al.</u> v. <u>UPS Freight Services, Inc., et al.</u>
Civil No. 13-1921 (PAD)
Opinion and Order
Page 52

**SO ORDERED**.

In San Juan, Puerto Rico, this 10th day of November, 2016.

<u>s/Pedro A. Delgado-Hernández</u>
PEDRO A. DELGADO-HERNÁNDEZ
United States District Judge